**COLLINS & AIKMAN CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 11533.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 7, 1967.

Decided May 8, 1968.

W. S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on the brief), for petitioner.

Leonard M. Wagman, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N.L.R.B., on the brief), for respondent.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

The petition of Collins & Aikman Corporation (the "company") to review and set aside an order of the Board, and the

Board's answer, in which it requests that its order be enforced, bring before us principally the question of whether the company violated § 8(a) (5) and (1) of the Labor-Management Relations Act, 29 U.S.C.A. § 158(a) (5) and (1), by refusing to bargain in good faith during contract negotiations carried on in 1965. Reversing its trial examiner, the Board found that the company refused to bargain in good faith. Its decision and order are reported in 165 N.L.R.B., No. 76.

After consideration of the record as a whole, we have concluded that substantial evidence does not support the Board's finding. Our resolution of the principal question requires us, also, to set aside the Board's ancillary findings that the company violated § 8(a) (3) and (1) in refusing to reinstate employees who went on strike, allegedly to protest the company's refusal to bargain, and that the company again violated § 8(a) (5) and (1) in August, 1966, when it withdrew recognition of the union because the union no longer represented a majority of the employees, in spite of the union's contention that its majority status had been dissipated as a result of the company's unfair labor practices. We do not disturb, however, the Board's finding that the company committed independent § 8(a) (1) violations during the course of negotiations in 1965. Thus, we enforce the portion of the Board's order predicated on the independent violations of § 8(a) (1) but refuse enforcement of the rest.

I

The union (the Textile Workers of America) was certified as the bargaining agent at the company's Albemarle, North Carolina, plant in May, 1965, following an election. Bargaining between the union and the company commenced on June 22 and continued on a regular basis until September 30. By September 15, the company and the union had agreed on contract provisions relating to union recognition, use of bulletin boards, a 4½% wage increase, commensurate with wage increases which the company had granted at its other North Carolina plants on June 28, covering several job classifications where the company concluded there were inequities, call-in and report-in pay, computation of incentive earnings on a daily shift basis, fatigue allowances, prohibition against the replacement of employees by supervisors, discipline and discharge, three steps of the grievance procedure, seniority, leaves of absence, health and safety, access to the plant by union representatives, and prohibition against discrimination by the company because of race, color, creed and sex. Until September 15 and thereafter until September 29, the company steadfastly adhered to its position that arbitration and check-off of union dues be excluded from the collective bargaining agreement while insisting that a no-strike provision, supported by a promise of union indemnification for its violation, be included. A bargaining deadlock appeared evident, and several of the company's minor supervisors expressed the view to certain employees that the company would never give the union a contract. Early in September, the union members, dissatisfied with the progress toward an overall contract which was being made, voted to strike on September 30 if an agreement had not been reached by that date.

Despite employee discontent at the progress which was being made, the negotiating sessions throughout September bore fruit. It was during them that the company's proposal for a 4½% wage increase, previously described, and agreement on an interim grievance procedure were advanced. On September 29, the company modified its position in regard to arbitration, check-off, and the no-strike clause [1] and offered $15,000 for the

1. The company agreed to arbitration if the union agreed to a suitable management clause; the company agreed to a voluntary and revocable check-off procedure; and the company agreed to relieve the union of potential liability under the no-strike clause.

adjustment of alleged wage inequities. The union regarded these proposals as inadequate and, at the negotiating session held on the morning of September 30, the company liberalized its offers.[2] The union continued to reject the company's proposals and concluded the session by saying, "It's going to take more money to set up this agreement." Later in the afternoon, the union requested that the company put its latest proposals in writing; the union did not, however, indicate that it had any intention of recommending these proposals to its members. The company agreed to submit its proposals in writing, but stated that, for reasons which were credited by the trial examiner, it would take several days to have the writing prepared.

On the evening of September 30, union representatives went, uninvited, to the company guesthouse, where the company's negotiators were staying. Their declared purpose was to avert the strike which was scheduled to begin that night, despite the fact that members of the union had been making physical preparations for the strike at the plant throughout the day. Upon the arrival at the guesthouse, the union representatives, and a federal mediator who accompanied them, were met with hostility by the company's negotiators, who appeared to regard the bargaining as temporarily closed. Nevertheless, a conversation ensued in which the union again requested that the company's latest proposals be put in writing and sought to reopen the negotiations. Although one of the union representatives stated that he thought that money was not the biggest issue remaining to be decided, two others continued to assert that more money would be necessary to settle the dispute.

At approximately 10:00 P.M., while discussion between the union and the company was being carried on, the company's negotiators received a telephone call from a manager at the plant, who told them that a picket line in front of the plant had begun. The trial examiner found from conflicting evidence that at the time the call was made "there was sufficient activity and people gathered on the road or lot for the reasonable assumption by * * * [the manager] that the strike had started." [3]

Upon receiving this telephone call, the company's negotiators withdrew all of the offers which the company had previously made, although the union representatives assured them that the strike had not yet officially begun. After further attempts to bargain proved futile, the president of the union went to the plant and gave his official blessing to the strike.

During the following weeks, contract negotiations continued. The company at first only offered the union the agreement as it stood as of September 15, but subsequently reoffered its proposals of September 30. The union negotiators accepted the contract in this form, and recommended it to the union membership, which approved it on October 30. Thus, after a strike of 30 days, the agreement which was reached corresponded to the offer made by the company on the eve of

---

2. The company initially withdrew its offer of the $15,000 inequity fund and offered, instead, to make its wage increase retroactive to June 28. The company later offered both the inequity fund and the retroactive wage increase. The company also acceded to the union's demand for protective clothing for the employees, and the company indicated it would consider improving incentive pay for mold line employees.

3. The Board ignored this finding in reversing the trial examiner. It supported its decision by the testimony of one witness who stated that when he passed the plant *shortly before* 10:00, he saw no activity which attracted his attention. Other witnesses testified that there was picketing activity at the plant at 10:00, and their testimony had been credited by the trial examiner. On cross-examination the witness relied upon by the Board admitted that when he again drove by the plant at 10:15, there were 25 to 40 people gathered at the plant. The insubstantiality of the evidence to support the Board's finding is thus evident.

the strike, which had been flatly rejected by the union.

On these facts, the Board rested its conclusion that petitioner had violated § 8(a) (5) on three grounds: (1) the statements made by supervisors during the month preceding the strike to the effect that the company would not give the union a contract, along with other isolated § 8(a) (1) violations committed during this period;[4] (2) the company's refusal to make concessions on the "important" issues of arbitration, check-off and the no-strike clause, until immediately before the strike deadline; and (3) the company's withdrawal of its proposals on the evening of September 30. We find that these asserted grounds, individually or collectively, do not demonstrate that the company bargained in bad faith.

The finding that the remarks attributed to the company's supervisors were in fact made by them, notwithstanding that they were controverted, cannot be seriously challenged; because this question turns solely on credibility and credibility was resolved by the trial examiner against the company. However, the trial examiner found a complete absence of reliable evidence showing that the supervisors who made these remarks were acting at the instigation of higher officials. The Board made no contrary finding on this point and, hence, did not disturb the factual conclusion which the trial examiner reached.

We do not consider that the § 8 (a) (1) violations, standing alone, will support the conclusion that the company violated § 8(a) (5) and, as we shall presently show, in the instant case, there is nothing to support the § 8(a) (5) violation except the § 8(a) (1) violations. There is no precedent for treating § 8(a) (1) violations committed at a time of contract negotiations where agreement on a contract is not forthcoming as a *per se* violation of § 8(a) (5). Manifestly, such a *per se* rule would require of a company knowledge of, and a degree of control over, *all* of the activities of *all* of its supervisors which are unrealistic to expect.[5] A series of § 8(a) (1) violations, many in number and committed by responsible management officials, or, if committed by minor supervisory authorities, shown to be known to or instigated by higher officials, may be evidence that a company is refusing to fulfill the duty to bargain created by § 8(a) (5); but where, as here, the remarks made to the employees were isolated, were made by minor supervisory authorities, were not shown to have the sanction of more responsible officials, and the record of the company at the bargaining table belies the supervisors' predictions and demonstrates that the company was willing to negotiate with the union, we do not think that the occurrence of the § 8(a) (1) violations in themselves supports the conclusion that the company violated § 8(a) (5).

The Board's reliance upon the fact that the company did not change its position

---

4. The most important of these violations were the interrogation of a job applicant as to her union affiliation, soliciting employees to withdraw from the union or to abandon the strike, threatening employees that the plant would be moved and that they would be unable to obtain new jobs in the area, threatening employees that they would not be rehired and statements that the employees would receive less pay and no increased monetary benefits under a collective bargaining agreement. Many of these violations occurred after the strike had started.

5. In its opinion the Board mentioned, and partially relied on, the fact that the company had a long history of opposition to unionization. Actually, this factor demonstrates the unreasonableness of a *per se* rule. Minor supervisors, who have been exposed to the company's union policy, may well expect and predict that the company will not sign a contract with a union. However, those in more responsible management positions are likely to decide, because of the duty imposed by § 8(a) (5), to reach an agreement with the union despite their antiunion leanings. Isolated § 8(a) (1) violations, like those which occurred here, may well be the residue of past company policy and not reflect present company policy.

in regard to arbitration, check-off and a no-strike clause until September 29 was equally improper. A company's uncompromising insistence upon contractual provisions which the union clearly cannot accept might indicate that the company is not bargaining in good faith, see, N.L.R.B. v. Tower Hosiery Mills, 180 F.2d 701, 703–705 (4 Cir.), cert. den., 340 U.S. 811, 71 S.Ct. 38, 95 L. Ed. 596 (1950); but it is only by this indirect route that the Board can sit in judgment on the substance of the company's proposals. See, N.L.R.B. v. Herman Sausage Co., 275 F.2d 229, 231–232 (1960).

■ In the case before us, it is uncontroverted that petitioner did make concessions on the three issues which the Board denominated as "important;" in fact, the company's proposals constituted the basis of the agreement which was ultimately reached. Moreover, during the period that the company adhered to its original position as to these three issues, bargaining was not otherwise stifled and agreement was reached on fifteen other subjects. The Board found this fact of no significance. Thus, the effect of its holding would be to require negotiators to resolve the most difficult issues confronting them before bargaining on the questions on which agreement is closer and which are more likely to yield to a relatively easy solution. Congress did not invest in the Board such broad power to control the schedule of matters to be considered in the process of collective bargaining.

■ We turn next to the third ground for the Board's conclusion that the company was guilty of bad faith bargaining—the company's withdrawal of its offers on the night of September 30. This action falls far short of demonstrating the company's bad faith. The record does affirmatively indicate that late in the evening, when the union representatives on their own initiative sought to reopen the negotiations, the company was reluctant to do so. However, by that time the company had made substantial concessions, so generous that the union subsequently accepted the same offers without modification and trumpeted the contract which incorporated them when conducting an organizational campaign at Schneider Mills, Taylorsville, North Carolina,[6] and had been met with a flat rejection by the union. During the conversations held at the company guesthouse on the night of the 30th, the union representatives gave no indication that all or any part of the company's proposals, previously rejected, were adequate, and asked for additional concessions. In this context, petitioner was under no obligation to reopen negotiations. Certainly, the fact that the union had made a strike imminent could not impose a duty upon the company to make additional offers to the union so that its failure to do so would constitute bad faith.

Although the company refused to give anything more to the union, it was not until the company was informed that the strike activity had started at the plant that the company's offers were withdrawn. The Board implies that the company's negotiators did not have reasonable grounds for this belief, but the insubstantiality of the evidence to the contrary has already been exposed.[7]

■ The Board also finds significance in the fact that the union representatives present at the guesthouse informed the company that the strike had not "officially" started, and that it did not "officially" start until the union president went to the plant after attempts at further negotiations had failed. We do not find significance in these facts. After picketing had started, the company could legitimately believe that, with or without the consent of their leaders,[8] the union

---

6. See Schneider Mills, Inc. v. N.L.R.B., 390 F.2d 375 (4 Cir. 1968).

7. See footnote 3, supra.

8. There are suggestions in the record that the union leaders were not fully in control of the union members. For example, it appears that on August 30 the em-

members had begun economic sanctions and totally altered the framework within which the dispute was to be settled. Under these circumstances, the company was justified in redrawing its plans and abandoning its previous negotiating position.

## II

As a consequence of its finding that the company violated § 8(a) (5) and (1) in refusing to bargain during the 1965 negotiations, the Board also found that the company violated § 8(a) (3) and (1) in refusing to reinstate 77 employees who had been replaced during the strike. Our conclusion that the company did not bargain in bad faith during the pre-strike contract negotiations prevents the strike from attaining the status of an unfair labor practice strike, and, therefore, erodes the Board's finding of a § 8 (a) (3) violation and relieves the company of the obligation to reinstate the strikers. Our disposition of this issue makes unnecessary an analysis of the company's additional claim that as to 40 of the strikers reinstatement was not required because of their strike misconduct.

Similarly, the Board's finding that the company violated § 8(a) (5) and (1) in withdrawing recognition of the union in August, 1966, cannot stand under our decision. The Board does not dispute the trial examiner's finding that the company had sufficient ground upon which to question the union's majority status, and thus to withdraw its recognition. Rather, the Board's decision is founded upon the premise that the company could not rely upon indicia of employee defection from the union in withdrawing recognition, because such defection was caused by its own unfair labor practices.

The independent § 8(a) (1) violations which the Board found to have been committed were relatively isolated and oc-

curred before the contract agreement was reached, and, as the Board impliedly concedes, cannot alone explain the widespread employee defection which is evident from the record. Therefore, in light of our holding that substantial evidence does not support a finding that the company violated § 8(a) (5) during the 1965 contract negotiations, we also hold that the company's withdrawal of recognition was proper.

Enforced in part and denied in part.

---

ployees were prepared to strike, despite the fact that the union's chief spokesman told them that "at least another month for negotiations" was necessary and that

the union members agreed to wait only on condition that a definite strike deadline of September 30 be set.