## H. K. PORTER CO., INC., DISSTON DIVISION-DANVILLE WORKS v. NATIONAL LABOR RELATIONS BOARD ET AL.

No. 230.   Argued January 15, 1970—Decided March 2, 1970

*Donald C. Winson* argued the cause for petitioner. With him on the brief were *Paul R. Obert, Thomas P. Luscher,* and *William Alvah Stewart.*

*Norton J. Come* argued the cause for respondent National Labor Relations Board.   With him on the brief were *Solicitor General Griswold, Joseph J. Connolly, Arnold Ordman,* and *Dominick L. Manoli. George H. Cohen* argued the cause for respondent United Steelworkers of America, AFL–CIO.   With him on the brief were *Elliot Bredhoff, Michael H. Gottesman,* and *Bernard Kleiman.*

*Lawrence M. Cohen* argued the cause for the Chamber of Commerce of the United States as *amicus curiae* urging reversal. With him on the briefs was *Milton A. Smith.*

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

After an election respondent United Steelworkers Union was, on October 5, 1961, certified by the National Labor Relations Board as the bargaining agent for certain employees at the Danville, Virginia, plant of the petitioner, H. K. Porter Co. Thereafter negotiations commenced for a collective-bargaining agreement. Since that time the controversy has seesawed between the Board, the Court of Appeals for the District of Columbia Circuit, and this Court. This delay of over eight years is not because the case is exceedingly complex, but appears to have occurred chiefly because of the skill of the company's negotiators in taking advantage of every opportunity for delay in an act more noticeable for its generality than for its precise prescriptions. The entire lengthy dispute mainly revolves around the union's desire to have the company agree to "check off" the dues owed to the union by its members, that is, to deduct those dues periodically from the company's wage payments to the employees. The record shows, as the Board found, that the company's objection to a checkoff was not due to any general principle or policy against making deductions from employees' wages. The company does deduct charges for things like insurance, taxes, and contributions to charities, and at some other plants it has a checkoff arrangement for union dues. The evi-

dence shows, and the court below found, that the company's objection was not because of inconvenience, but solely on the ground that the company was "not going to aid and comfort the union." Efforts by the union to obtain some kind of compromise on the checkoff request were all met with the same staccato response to the effect that the collection of union dues was the "union's business" and the company was not going to provide any assistance. Based on this and other evidence the Board found, and the Court of Appeals approved the finding, that the refusal of the company to bargain about the checkoff was not made in good faith, but was done solely to frustrate the making of any collective-bargaining agreement. In May 1966, the Court of Appeals upheld the Board's order requiring the company to cease and desist from refusing to bargain in good faith and directing it to engage in further collective bargaining, if requested by the union to do so, over the checkoff. *United Steelworkers* v. *NLRB,* 124 U. S. App. D. C. 143, 363 F. 2d 272, cert. denied, 385 U. S. 851.

In the course of that opinion, the Court of Appeals intimated that the Board conceivably might have required petitioner to agree to a checkoff provision as a remedy for the prior bad-faith bargaining, although the order enforced at that time did not contain any such provision. 124 U. S. App. D. C., at 146–147, and n. 16, 363 F. 2d, at 275–276, and n. 16. In the ensuing negotiations the company offered to discuss alternative arrangements for collecting the union's dues, but the union insisted that the company was required to agree to the checkoff proposal without modification. Because of this disagreement over the proper interpretation of the court's opinion, the union, in February 1967, filed a motion for clarification of the 1966 opinion. The motion was denied by the court on March 22, 1967, in an

order suggesting that contempt proceedings by the Board would be the proper avenue for testing the employer's compliance with the original order. A request for the institution of such proceedings was made by the union, and, in June 1967, the Regional Director of the Board declined to prosecute a contempt charge, finding that the employer had "satisfactorily complied with the affirmative requirements of the Order." App. 111. The union then filed in the Court of Appeals a motion for reconsideration of the earlier motion to clarify the 1966 opinion. The court granted that motion and issued a new opinion in which it held that in certain circumstances a "checkoff may be imposed as a remedy for bad faith bargaining." *United Steelworkers* v. *NLRB,* 128 U. S. App. D. C. 344, 347, 389 F. 2d 295, 298 (1967). The case was then remanded to the Board and on July 3, 1968, the Board issued a supplemental order requiring the petitioner to "[g]rant to the Union a contract clause providing for the checkoff of union dues." 172 N. L. R. B. No. 72, 68 L. R. R. M. 1337. The Court of Appeals affirmed this order, *H. K. Porter Co.* v. *NLRB,* 134 U. S. App. D. C. 227, 414 F. 2d 1123 (1969). We granted certiorari to consider whether the Board in these circumstances has the power to remedy the unfair labor practice by requiring the company to agree to check off the dues of the workers. 396 U. S. 817. For reasons to be stated we hold that while the Board does have power under the National Labor Relations Act, 61 Stat. 136, as amended, to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement.

Since 1935 the story of labor relations in this country has largely been a history of governmental regulation of the process of collective bargaining. In that year Con-

gress decided that disturbances in the area of labor relations led to undesirable burdens on and obstructions of interstate commerce, and passed the National Labor Relations Act, 49 Stat. 449. That Act, building on the National Industrial Recovery Act, 48 Stat. 195 (1933), provided that employees had a federally protected right to join labor organizations and bargain collectively through their chosen representatives on issues affecting their employment. Congress also created the National Labor Relations Board to supervise the collective-bargaining process. The Board was empowered to investigate disputes as to which union, if any, represented the employees, and to certify the appropriate representative as the designated collective-bargaining agent. The employer was then required to bargain together with this representative and the Board was authorized to make sure that such bargaining did in fact occur. Without spelling out the details, the Act provided that it was an unfair labor practice for an employer to refuse to bargain. Thus a general process was established that would ensure that employees as a group could express their opinions and exert their combined influence over the terms and conditions of their employment. The Board would act to see that the process worked.

The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement. But it was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its

own views of a desirable settlement. This fundamental limitation was made abundantly clear in the legislative reports accompanying the 1935 Act. The Senate Committee on Education and Labor stated:

> "The committee wishes to dispel any possible false impression that this bill is designed to compel the making of agreements or to permit governmental supervision of their terms. It must be stressed that the duty to bargain collectively does not carry with it the duty to reach an agreement, because the essence of collective bargaining is that either party shall be free to decide whether proposals made to it are satisfactory." [1]

The discussions on the floor of Congress consistently reflected this same understanding.[2]

The Act was passed at a time in our Nation's history when there was considerable legal debate over the con-

---

[1] S. Rep. No. 573, 74th Cong., 1st Sess., 12 (1935).

[2] "Let me say that the bill requires no employer to sign any contract, to make any agreement, to reach any understanding with any employee or group of employees. . . .

"Nothing in this bill allows the Federal Government or any agency to fix wages, to regulate rates of pay, to limit hours of work, or to effect or govern any working condition in any establishment or place of employment.

"A crude illustration is this: The bill indicates the method and manner in which employees may organize, the method and manner of selecting their representatives or spokesmen, and leads them to the office door of their employer with the legal authority to negotiate for their fellow employees. The bill does not go beyond the office door. It leaves the discussion between the employer and the employee, and the agreements which they may or may not make, voluntary and with that sacredness and solemnity to a voluntary agreement with which both parties to an agreement should be enshrouded." Remarks of Senator Walsh, 79 Cong. Rec. 7659; see also 79 Cong. Rec. 9682, 9711.

stitutionality of any law that required employers to conform their business behavior to any governmentally imposed standards. It was seriously contended that Congress could not constitutionally compel an employer to recognize a union and allow his employees to participate in setting the terms and conditions of employment. In *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), this Court, in a 5-to-4 decision, held that Congress was within the limits of its constitutional powers in passing the Act. In the course of that decision the Court said:

> "The Act does not compel agreements between employers and employees. It does not compel any agreement whatever. . . . The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel." *Id.*, at 45.

In 1947 Congress reviewed the experience under the Act and concluded that certain amendments were in order. In the House committee report accompanying what eventually became the Labor Management Relations Act, 1947, the committee referred to the above-quoted language in *Jones & Laughlin* and said:

> "Notwithstanding this language of the Court, the present Board has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make. . . .
>
> "[U]nless Congress writes into the law guides for the Board to follow, the Board may attempt to

carry this process still further and seek to control more and more the terms of collective-bargaining agreements." [3]

Accordingly Congress amended the provisions defining unfair labor practices and said in § 8 (d) that:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, *but such obligation does not compel either party to agree to a proposal or require the making of a concession.*" [4]

In discussing the effect of that amendment, this Court said it is "clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *NLRB* v. *American Ins. Co.,* 343 U. S. 395, 404 (1952). Later this Court affirmed that view stating that "it remains clear that § 8 (d) was an attempt by Congress to prevent the Board from controlling the settling of the terms of collective bargaining agreements." *NLRB* v. *Insurance Agents,* 361 U. S. 477, 487 (1960). The parties to the instant case are agreed that this is the first time in the 35-year history of the Act that the Board has ordered either an employer or a union to agree to a substantive term of a collective-bargaining agreement.

---

[3] H. R. Rep. No. 245, 80th Cong., 1st Sess., 19–20 (1947).

[4] 29 U. S. C. § 158 (d) (emphasis added).

Recognizing the fundamental principle "that the National Labor Relations Act is grounded on the premise of freedom of contract," 128 U. S. App. D. C., at 349, 389 F. 2d, at 300, the Court of Appeals in this case concluded that nevertheless in the circumstances presented here the Board could properly compel the employer to agree to a proposed checkoff clause. The Board had found that the refusal was based on a desire to frustrate agreement and not on any legitimate business reason. On the basis of that finding the Court of Appeals approved the further finding that the employer had not bargained in good faith, and the validity of that finding is not now before us. Where the record thus revealed repeated refusals by the employer to bargain in good faith on this issue, the Court of Appeals concluded that ordering agreement to the checkoff clause "may be the only means of assuring the Board, and the court, that [the employer] no longer harbors an illegal intent." 128 U. S. App. D. C., at 348, 389 F. 2d, at 299.

In reaching this conclusion the Court of Appeals held that § 8 (d) did not forbid the Board from compelling agreement. That court felt that "[s]ection 8 (d) defines collective bargaining and relates to a determination of *whether* a . . . violation has occurred and not to the *scope* of the remedy which may be necessary to cure violations which have already occurred." 128 U. S. App. D. C., at 348, 389 F. 2d, at 299. We may agree with the Court of Appeals that as a matter of strict, literal interpretation that section refers only to deciding when a violation has occurred, but we do not agree that that observation justifies the conclusion that the remedial powers of the Board are not also limited by the same considerations that led Congress to enact § 8 (d). It is implicit in the entire structure of the

Act that the Board acts to oversee and referee the process of collective bargaining, leaving the results of the contest to the bargaining strengths of the parties. It would be anomalous indeed to hold that while § 8 (d) prohibits the Board from relying on a refusal to agree as the sole evidence of bad-faith bargaining, the Act permits the Board to compel agreement in that same dispute. The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself.[5] One of these fundamental policies is freedom of contract. While the parties' freedom of contract is not absolute under the Act,[6] allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.

In reaching its decision the Court of Appeals relied extensively on the equally important policy of the Act that workers' rights to collective bargaining are to be secured. In this case the court apparently felt that

---

[5] "If . . . the Board shall be of the opinion that any person . . . has engaged in or is engaging in any . . . unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of [the Act]." 29 U. S. C. § 160 (c).

[6] For example, the employer is not free to choose any employee representative he wants, and the representative designated by the majority of the employees represents the minority as well. The Act itself prohibits certain contractual terms relating to refusals to deal in the goods of others, 29 U. S. C. § 158 (e). Various practices in enforcing the Act may to some extent limit freedom to contract as the parties desire. See generally Wellington, Freedom of Contract and the Collective Bargaining Agreement, 112 U. Pa. L. Rev. 467 (1964).

the employer was trying effectively to destroy the union by refusing to agree to what the union may have considered its most important demand. Perhaps the court, fearing that the parties might resort to economic combat, was also trying to maintain the industrial peace that the Act is designed to further. But the Act as presently drawn does not contemplate that unions will always be secure and able to achieve agreement even when their economic position is weak, or that strikes and lockouts will never result from a bargaining impasse. It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength to try to secure what it cannot obtain through bargaining. It may well be true, as the Court of Appeals felt, that the present remedial powers of the Board are insufficiently broad to cope with important labor problems. But it is the job of Congress, not the Board or the courts, to decide when and if it is necessary to allow governmental review of proposals for collective-bargaining agreements and compulsory submission to one side's demands. The present Act does not envision such a process.

The judgment is reversed and the case is remanded to the Court of Appeals for further action consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE WHITE took no part in the decision of this case.

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

I join in the Court's opinion on the understanding that nothing said therein is meant to disturb or question the primary determination made by the Board and sus-

tained by the Court of Appeals, that petitioner did not bargain in "good faith," and thus may be subjected to a bargaining order enforceable by a citation for contempt if the Board deems such a proceeding appropriate.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART concurs, dissenting.

The Court correctly describes the general design and main thrust of the Act. It does not encompass compulsory arbitration; the Board does not sit to impose what it deems to be the best conditions for the collective-bargaining agreement; the obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession." § 8 (d) of the Act.

Yet the Board has the power, where one party does not bargain in good faith, "to take such affirmative action . . . as will effectuate the policies" of the Act. § 10 (c) of the Act.

Here the employer did not refuse the checkoff for any business reason, whether cost, inconvenience, or what not. Nor did the employer refuse the checkoff as a factor in its bargaining strategy, hoping that delay and denial might bring it in exchange favorable terms and conditions. Its reason was a resolve to avoid reaching any agreement with the union.

In those narrow and specialized circumstances, I see no answer to the power of the Board in its discretion to impose the checkoff as "affirmative action" necessary to remedy the flagrant refusal of the employer to bargain in good faith.

The case is rare, if not unique, and will seldom arise. I realize that any principle once announced may in time gain a momentum not warranted by the exigencies of its creation. But once there is any business consideration

that leads to a denial of a demand or any consideration of bargaining strategy that explains the refusal, the Board has no power to act. Its power is narrowly restricted to the clear case where the refusal is aimed solely at avoidance of any agreement. Such is the present case. Hence, with all respect for the strength of the opposed view, I dissent.