**MOORE OF BEDFORD, INCORPO- RATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
**and**
**Textile Workers Union of America, AFL-CIO, CLC, Intervenor.**

**No. 71-1067.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 1, 1971.

Decided Nov. 15, 1971.

Guy Farmer, Washington, D. C. (Patterson, Belknap, Farmer & Shibley, Washington, D. C. on brief), for petitioner.

Stanley J. Brown, Atty., N. L. R. B. (Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen., Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Leonard M. Wagman, Atty., N. L. R. B., on brief), for respondent.

Alan Gordon (Patricia E. Eames and Joel Ronald Ax, New York City, on brief), for intervenor.

Before BRYAN, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

This is a petition for review by Moore of Bedford, Incorporated to set aside an

order of the National Labor Relations Board, and a cross-application by the Board for enforcement of its order. The Board's order is reported at 187 N. L.R.B. No. 87, and reads in relevant part as follows:

"[M]oore of Bedford, * * * shall:

1. Cease and desist from
   (a) Insisting, as a condition to entering into an agreement with the Union or any other exclusive bargaining representative of its employees in the appropriate unit, upon contract provisions which would grant it the uncontrolled right to fix rates of pay for piecework unilaterally and at the same time deny to employees their rights to file grievances as to rates of pay for piecework." [1]

The Trial Examiner and a majority of the Board concluded that the Company had engaged in unfair labor practices in violation of Sections 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5), because, in negotiating a new contract with the Textile Workers Union of America, the Company had insisted upon the right to fix the rates of pay for new piecework and at the same time insisted upon limiting arbitration of grievances concerning new piecework rates to the question of whether or not an employee could earn the base rate.[2] A strike followed the breakdown in negotiations and upon complaint filed by the Union, the Board determined this strike was an unfair labor practice strike rather than an economic strike, and imposed the usual sanctions.

It is unclear from the record whether or not the Company was unyielding in its insistence upon the above provision in the new contract negotiations. But assuming it did so insist, we conclude that there is not substantial evidence on the record as a whole to support the conclusion that such insistence was an unfair labor practice, and we decline enforcement to the Board's order.

I

The Company manufactures upholstered furniture and operates its principal place of business at Bedford, Virginia, where this dispute arose. The majority of employees at the Bedford Plant had traditionally been paid on an incentive piecework basis,[3] and in December of 1968, approximately two-thirds of the 130 employees were compensated in this manner. It is around the piecework employees and their compensation that this dispute centers.

The compensation for each detailed operation which an employee is called upon to perform is not constant. Changes in the piece rate based on time studies and other industrial engineering techniques are not infrequent. In addition, new operations are added and old ones dropped as furniture styles change. The Trial Examiner found that the number of separate and distinct operations evaluated and fixed are about

---

1. The Board's order also contained the usual provisions requiring the Company to bargain collectively with the Union with respect to rates of pay, wages, hours of employment, and other terms of employment, and to embody any understanding reached in a signed agreement. In addition, on the premise that the strike was an unfair labor practice strike, the Company was required to reinstate all workers who made an unconditional offer to return to work in December 1969 to their former positions without loss of seniority and with back pay from the date of their offer.

2. General Counsel conceded "that in no other respect is there distinct evidence of anti-union animus or illegal conduct." App. 323.

3. By this method the amount of compensation a piecework employee will receive is determined by the combination of the rate set for each different operation he performs and the number of times he satisfactorily performs such operation.

2,000 in any year,[4] and that, "The contract had always provided that the Company could set wage rates in this fashion, and that the Union could file grievances when employees felt the rates were unfairly established, and even go to binding arbitration on the questions." Moore of Bedford, 76 L.R.R.M. 1182 (January 7, 1971). The 1965 contract allowed the Company unilaterally to adjust piece rates subject to the proviso that, "[S]uch change will reflect the extent of the change made," and provided that, "[A]n incentive employee * * * can * * * earn not less than twenty-five percent (25%) above the piece rate base."[5] App. at 187. At this time the piece rate base for newly set piece rates was $1.28. App. at 202. In the September 1967 extension of this agreement, the computation of the base rate was changed from 25% above the piece rate base to a flat piece rate base figure of $1.70 per hour. App. at 206–207.

In 1968, for the first time, four grievances went to arbitration. The Company contended that Article VI, as amended by the 1967 extension, Section 4, above, should be interpreted to mean that wage grievances could be arbitrated only if piecework rates were set so that incentive employees, exerting normal effort, could not earn $1.70 per hour (the then existing piece rate base). The arbitrator rejected this view and agreed with the Union that "reflect the extent of the change made" meant that new rates would always be set so as to maintain the average wages the employees had in fact been earning, App. at 322, which varied from 41 cents above the piece rate base in 1965 to 84 cents in 1968.

Negotiations on a new contract to replace the one expiring on December 31, 1968, began on December 18, 1968. During these negotiations the Company insisted on contract provisions which would give it the power to set the rates for piece work, but would limit arbitration of grievances to the question of whether an employee, with the exercise of incentive effort, could earn the base rate.[6] The Trial Examiner found that it was the desire of the Company thereby to incorporate in the new contract the interpretation of the old contract rejected by the arbitrator.

During the negotiations the Company increased its offer on the base rate from that contained in the 1967 extension of the contract in addition to making various offers concerning fringe benefits, with the last base rate offer varying from $1.80 to $2.00 per hour depending on the type of job involved. However, the Trial Examiner found that the impasse between the parties and the resultant strike on January 28, 1969, came about because of the Company's adamant insistence upon its right to set piece rates and the related grievance and arbitration clause.[7] The strike lasted for

---

4. At the oral argument the Company maintained that the total number of distinct operations was 2,000, but that only about 400 would be changed each year. However, the Company did have the power to change all piece rates should it desire to do so.

5. Article VI, Section 4 of the 1965 contract reads as follows:
"Piece work rates may be changed by the Employer upwardly or downwardly during the term of this agreement, due to method changes or changes in job content, provided such change will reflect the extent of the change made, and provided they will be so set that an incentive employee who is not a learner, trainee, or substandard worker can, with the exercise of incentive effort, earn not less than twenty-five per cent (25%) above the piece rate base which percentage is the established differential under standard conditions."

6. The Company strongly urges that its last offer was a retraction of this position, and indicated a willingness to return to the old contract provision of Article VI, Section IV. In light of disposition of the case, it is unnecessary to reach this contention.

7. The provisions in question read as follows:
Article VI(4)—The Company shall have sole determination in the establishment of incentive rates. Rates may be changed by the Company upwardly or downwardly during the term of this agreement, due to changes in methods, material,

about a year,[8] ending when the Union made an unconditional offer to return to work on December 18, 1969.

The Board accepted the Trial Examiner's conclusion that, "the Respondent's purpose was to remove the Union as a voice in the determination of what two-thirds of the employees would be paid for their work and indicated an insistence upon the right to set wages at will throughout the life of the contract without regard to the existence of a bargaining agent or spokesman for the employees." 76 L.R.R.M. at 1183. We think that the record does not support this conclusion.

■ We agree with the Board that an employer is bound to discuss wages and bargain about them in good faith. However, we do not agree that the insistence upon its proposed Article VI, Sections 4 and 5, amounted to a refusal to bargain about wages. It is clear that the Company never refused to negotiate the base rate. Therefore the insistence upon limiting the arbitration and grievance procedure to whether or not the base rate could be earned was not to insist upon the right to set wages unilaterally throughout the life of the contract.

The Company contends that its proposed Article VI(5) does not limit the filing of grievances or negotiation about individual piece rates, but only restricts binding arbitration to the question of whether the base rate could be earned. The Trial Examiner, however, found that this article would mean, "[T]he total exclusion of the piece rate setting prerogative reserved to the employer from grievance and arbitration." App. at 333. The Examiner's interpretation seems an unlikely one in view of the established tradition with respect to piece rates and the history of harmonious relations between this Company and the Union. But whether or not subject to grievance procedures, it is doubtless true that this clause would have given the Company the power to lower all wages to the base rate by simply setting unreasonably low individual piece rates. It is this power coupled with the limitation on binding arbitration which seems to have been determinative for the Trial Examiner and the Board.

The Trial Examiner concluded that the base rates proposed by the Company bore no relation to what the employees had been earning and that the Company, although willing to pay its piecework employees more than the base rate, adamantly refused to contract to do so. The Board agreed and concluded that it was the piecework incentive rates which actually established the real wages of the piecework employees, and that by having the power to set low piece rates and thus lower rates of pay to the base rate, the Company was in reality insisting upon unilateral control over wages since its proposed rates were, in the Board's view, so low as to be meaningless.

■ What the Board and the Trial Examiner seem to have overlooked is that the Company was not adamant that the base rate remain at the 1965 figure of $1.28 plus 25%, the 1967 figure of $1.70, the Company's initial negotiating proposal of $1.80 per hour, (*see* page 7

equipment, job assignment, changes in the job content and the clerical errors; provided such change or changes reflect the extent of the change made; and provided that incentive rates will be so set that an employee who is not a learner, trainee, or substandard worker, can, with the exercise of incentive effort, earn not less than $1.80 per hour.
Article VI(5)—The grievance procedure, including arbitration, of the disputes arising under this Article, shall be limited to determining whether or not the Em-

ployee is getting the hourly rate for the job; or in the case of piece workers, whether the Employee can, with the exercise of incentive effort, earn not less than $1.80 per hour. 76 L.R.R.M. at 1182.

8. The Company and the Union disagree as to which one actually broke off negotiations and also with regard to events during the strike, but the record supports the Board's resolution of these issues.

note 8 *supra*) or even its subsequent offer of $2.00 as to some classification. Regardless of whether or not the base rate figures advanced by the Company were such a low rate of pay as to be meaningless [9] in light of what the employees had earned and what they expected to earn, the record discloses that the Company at no time refused to negotiate this base rate. The last offer made by the Company was a base rate which varied from $1.80 to $2.00 depending on the employee classification. Nowhere does it appear that this was a final non-negotiable proposal. Furthermore, it seems that this proposal was the last one only because the Union voted to strike shortly after it was made. In short, there is simply no evidence that the Company refused to negotiate the base rate. The Company did insist upon a unilateral initial determination of piece rates—not at all unusual in the industry. However, if the base rate were raised sufficiently, the Company would not have unilateral *control* over wages, even assuming arguendo that the Board was correct in its assertion that the average earnings of the employees represented the actual wages of the employees around which bargaining had to center. The idea that the Company was refusing to bargain about wages merely by insisting upon its proposals, independent of what the base rate was, is untenable because the Board's theory depends upon the base rate being so low as

to be meaningless. Therefore, we find that the Board's conclusion that the Company refused to bargain about wages is not supported by substantial evidence.

## II

In the context of these negotiations, the Board's order, while couched in general negative terms, actually requires the Company either, to abandon its proposed contract provision and accept the old contract provision as interpreted by the arbitrator or to accept straight hourly wages for all employees. Even if the Company had actually refused to bargain realistically about wages, which it did not, we think that the Board's order would violate Section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) [10] because, under the circumstances of this case, it actually required the Company to agree to a substantive contractual provision of a collective bargaining agreement. This the Board was without power to do. H. K. Porter Co. v. N. L. R. B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), Tex Tan Welhausen Co. v. N. L. R. B., 434 F.2d 405 (5th Cir. 1970). However, in light of our conclusion that the Company did not refuse to bargain about wages, the Board's order is defective for the more fundamental reason that the conclusions upon which it is based are not supported by substantial evidence.

Enforcement denied.

9. There is real conflict regarding the difference between the base rate and what the employees were earning. The Board contends that the average earnings of the piecework employees was $2.55 an hour. The Company points out that this average is a composite of classifications, and in some classifications the average earnings were $2.19 per hour, $2.24 per hour and $2.28 per hour.

10. 8(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.