In re BRANIFF AIRWAYS, INC., et al., Debtors.

Bankruptcy Nos. 482–00368, 482–00369.

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Dec. 6, 1982.

Robert S. Savelson, Cohen, Weiss & Simon, Michael Crames, Levin & Weintraub, New York City, Jack Balzersen, Rochell, King & Balzersen, Dallas, Tex., James Riley, Gen. Counsel, Braniff Int'l World Hdqts., Dallas-Ft. Worth Airport, Tex., Melvin Garbow, David Bonderman, Arnold & Porter, Washington, D.C., for Braniff.

John O'B. Clarke, Jr., Ernest W. DuBester, Highsaw & Mahoney, P.C., Washington, D.C., for IAM.

## MEMORANDUM OPINION

JOHN FLOWERS, Bankruptcy Judge.

This dispute arising in debtor's chapter 11 bankruptcy case concerns the debtor's efforts under § 365 of the Bankruptcy Code ("Code") to reject its collective bargaining agreement dated April 7, 1979 with the

International Association of Machinist and Aerospace Workers ("IAM"). The Union opposes the rejection.

▮ Initially, the IAM challenges the debtor's right to use § 365 to reject its collective bargaining agreement arguing that its rights are governed by the Railway Labor Act which absolutely prohibits unilateral changes including termination of such agreements. The relevant portions of the Railway Labor Act provide:

> No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in Section 6 of this Act. [45 U.S.C. § 156]

45 U.S.C. § 152 Seventh.

The pertinent portions of § 365 the Bankruptcy Code provide:

> ... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

The IAM advances a plethora of arguments based upon the wording and interaction of the statutes which can be summarized in two basic positions. First, that the two statutes should be construed to avoid conflict by interpreting the more general bankruptcy provisions to preclude the right to reject collective bargaining agreements thus requiring debtor to use the more specific provisions of the Railway Labor Act. Second, they argue that if a conflict exists between the two statutes it should be resolved in favor of the Railway Labor Act. Both of these basic arguments, as well as all of the various sub-arguments, have been considered and rejected by three separate Circuit Courts of Appeal on four occasions. See *Shopman's Loc. U. No. 455, etc. v. Kevin Steel Products, Inc.,* 519 F.2d 698 (2d Cir., 1975); *Brotherhood of Railway, etc. v. REA Express, Inc.,* 523 F.2d 164 (2nd Cir., 1975); *Local Joint Executive Bd., et al. v. Hotel Circle,* 613 F.2d 210 (9th Cir., 1980); *In re Bildisco,* 682 F.2d 72 (3rd Cir., 1982). The Fifth Circuit has not yet ruled on this issue.

*Kevin Steel, REA* and *Hotel Circle* involved a construction of the provisions of the Bankruptcy Act rather than of the Code. That distinction, however, is insignificant because the statutory provisions regarding the rights of a debtor to reject executory contracts are the same in the Code as they were in the Bankruptcy Act. The IAM's argument, that the wording of § 1167 of the Code, which denies the right to reject collective bargaining agreements in railroad cases, is broader than its predecessor in § 77(n) of the Bankruptcy Act and therefore changes the result here, is without merit. Section 77(n) was limited to railroad employees and by § 103(g) the Bankruptcy Code limits § 1167 to cases concerning a railroad. The change was merely in statutory organization and there is no indication Congress intended a change in the law. The literal language and clear intent remain the same, the restriction on the right to affect collective bargaining agreements applies only to employees of debtor railroads. This is not a railroad case.

In view of the unanimity of the other circuits which have considered this question, I will follow their lead and hold the collective bargaining agreement in issue here is subject to rejection under § 365.

The IAM urges that if rejection of the collective bargaining agreement is permitted it should be partial rejection, limited to those sections of the agreement shown to be burdensome, thus leaving the balance intact and enforceable. They contend that this solution is the way to alleviate the tension between the two statutes. The IAM cites no cases in support of this position and § 365 does not address partial rejections. The debtor's response is that partial rejection is precluded by the Supreme Court's holding in *H.K. Porter Company, Inc. v. National Labor Relations Board, et al.,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which prohibits forcing either party to collective bargaining to agree to a particular provision. That is not the case here because the debtor is seeking to avoid its prior

agreement and is not being forced into a particular provision. I do not reach the issue of whether partial rejection is ever possible because it should not be permitted where, as here, the rejected portions destroy the internal integrity of the agreement and substantially upset the relative bargaining positions of the parties. Such agreements are the result of negotiating give and take and for a court to excise a substantial provision would frustrate the parties more than permitting rejection of the entire agreement and sending them back for new negotiations.

Finally, the IAM contends the agreement cannot be rejected until the parties have continued to negotiate and an irreconcilable impasse has been reached. I reject that argument for two reasons. First, the requirement to negotiate as urged by the IAM is not a precondition to rejection under either § 365 or the cases construing it. *REA*, supra, held that the debtor's obligation is to negotiate in good faith for a reasonable time when employees are working under the belief that their employment is to continue on the same terms. That is not the case here. All employees were terminated on May 12, 1982 and the debtor timely notified the union of its desire to renegotiate. If a debtor refuses to negotiate that would be relevant on the issue of whether the debtor's motivation is solely to rid itself of the union, which is contrary to our national labor policy, and one of the equity factors to be considered. Second, although there have been charges back and forth, and it is difficult to ascertain a parties' intention when negotiating strategy is involved, it appears from all the facts that in spite of the debtor's sincere efforts to negotiate, the IAM has refused to do so. Obviously, there could never be rejection of a collective bargaining agreement if negotiations are absolutely essential and the union refuses to participate. Moreover, there are times when, because of compelling reasons, negotiations will not be required. Here, for example the time limits placed on the debtor by its potential joint venture partner, Pacific Southwest Airlines ("PSA"), the large number of jobs at stake and the dearth of other potential partners lead the to inescapable conclusion that a prerequisite of extended negotiation with a recalcitrant union should not be imposed when it destroys all possibility of reorganization.

The final legal issue to be decided is the standard to be used in determining whether to permit rejection. In *Kevin Steel,* supra, at 707, the Second Circuit held the decision to reject "... should not be based solely on whether it will improve the financial status of the debtor", which is the usual case with commercial contracts. Rather, the court adopted a test from *In re Overseas National Airways,* 238 F.Supp. 359 (E.D.N.Y., 1965) which requires a thorough scrutiny and a careful balancing of the competing equities of the debtor and the union. Consideration must be given to the effect rejection would have on the ability of employees to adequately formulate a claim for their intangible rights under the collective bargaining agreement such as seniority, welfare, pension rights and the like. A month after it decided *Kevin Steel* the Second Circuit in the *REA* case again discussed the standard to be used in these cases and stated rejection should be permitted only when it appears the agreement is so burdensome that it would thwart efforts to save the debtor, thus causing its failure and the loss of all employment. In the *Bildisco* case the Third Circuit also considered the standard to be applied in making this determination and rejected the more stringent test of *REA* for two reasons. First, because it was unworkable in that it required a prediction of success in the reorganization although it could well be impossible to make such a prediction at the stage of the proceedings when the issue arises. Second, because the more stringent test "... unduly exhaults the perpetration of the collective bargaining agreement over the more pragmatic consideration of whether the employees will continue to have jobs at all." *Bildisco,* supra, at 80. In lieu of the *REA* standard, *Bildisco* adopted a watered-down test requiring a "reasoned determination that rejection ... will assist

the debtor-in-possession or the trustee to achieve a satisfactory reorganization." *Id.* at 81. Additionally, *Bildisco* requires a showing the agreement is burdensome to the estate and that the court weigh the competing equities between claims arising from rejection of the collective bargaining agreement, the claims of other creditors, the rights of the employees, the national labor policy, and the sacrifices being made by the other creditors.

I find the *Bildisco* approach fair, logical and consistent with the realities of corporate reorganizations which present more basic problems than those arising in the usual collective bargaining situation. While the purpose of collective bargaining is to avoid disruption of commerce and resolve differences which threaten the continuity of work, in a reorganization situation the very existence of jobs becomes a prime factor. Corporate reorganizations are fragile at best and subject to innumerable variables so that rarely, if ever, will the bankruptcy court be able to determine whether rejection is absolutely essential to avoid thwarting reorganization. The more moderate approach of *Bildisco* recognizes that rejection should not be allowed lightly and only when it assists a reorganization. This assumes that a reorganization is a realistic possibility. The requirement of balancing the competing equities is an essential part of the tests in each of the three leading cases. Rejection solely to improve the financial status of the debtor should not be permitted.

In summary, to achieve rejection of a collective bargaining agreement the debtor must establish that rejection will assist the debtor to reorganize. The agreement must be shown to be burdensome to the estate and the competing equities must balance in favor of rejection. Those equities which the court must balance include the employee claims arising from rejection giving consideration to their ability to convert intangible rights into a liquidated amount, the claims of all other creditors, the rights of the employees in the context of our national labor policy, the sacrifices being made by others, and the preservation of jobs. See *In re Brada Miller Freight Systems, Inc.,* 16 B.R. 1002 (D.C.N.D.Ala., 1981).

■ The facts here show a debtor that is insolvent. It formerly employed over 9,000 workers and was one of the major air carriers in the United States. In a classic domino effect, a loss of public confidence in its ability to survive caused a dramatic drop in advance ticket purchases and brought on a cash flow shortage which made further operations impossible and resulted in the cessation of all operations the day before it filed for reorganization. At that time substantially all employees were terminated. It has a variety of leased or owned facilities at airports throughout the world, aircraft and ground support equipment all used in connection with the operation of an airline business. It has essentially two choices for reorganization: restart in the airline business or engage in support operations for other carriers. The former choice provides the most efficient use of its assets and will provide jobs for the greater number of former employees. Since support operations would be a change in its basic business that option would provide substantially fewer jobs. It is estimated that an airline restart would provide between 1500 and 2000 jobs with the support operation providing only 200. Clearly a restart is the preferable form of reorganization for the former employees, creditors and the public. However, the debtor's short cash position precludes restarting without outside help. Moreover, it is absolutely essential to any revived airline operations that debtor have public confidence in its ability to survive thus requiring some type of an association with an established carrier. The airline industry is in an economically depressed state with most carriers having furloughed employees, some in substantial numbers. The debtor's only chance to join with another carrier in some type of joint venture is dependent upon the debtor reducing its operating costs to the point where it becomes more economically attractive to potential partners to join with the debtor rather than to expand internally. All potential partners have negotiated in terms of debtor achieving an oper-

ating cost of less than six cents per available seat mile.[1] Achievement of this goal requires a reduction of fixed expenses and the institution of economies in the areas of wages and work rules covered by the collective bargaining agreement to eliminate "make work" provisions, commonly called scope provisions or feather-bedding.

The debtor's debt structure consists of unsecured creditors with claims totalling in excess of $500 million, excluding deficiencies to secured creditors which may be as much as an additional $100 million. It is impossible to determine the priority claims with great accuracy at this time because of numerous legal disputes about which claims are entitled to priority status. Undisputed priorities are estimated to be $25 million, the disputed ones much larger. For example, the debtor's pension plans have been terminated. The PBGC or plan participants are asserting priority status for the unfunded debt due the various plans which totals between $60 million and $80 million. At this stage it appears that unsecured creditors will not receive anything in liquidation. Consequently, their hopes are totally dependent upon a reorganization.

Debtor has been engaged in extensive negotiations with PSA for a joint operating agreement. In furtherance of that agreement debtor has proposed to the IAM a reduction of the average direct labor costs[2] from $14.27 per hour to $10.56 per hour, reduction of the benefit package, elimination of provisions requiring duplication of work, substitution of a profit sharing plan for the pension plan and elimination of seniority of debtor's employees over those of PSA. The latter provision being mandated by PSA because of its collective bargaining agreement with its employees. In the event of rejection debtor is required to continue to negotiate with the IAM (see *REA*, supra,) and pending an agreement it proposes to recall from the seniority list and offer jobs according to its proposal. Sav-

ings to the debtor under its proposal, based on the PSA joint venture estimates, will amount to approximately $3.8 million per year.

It is apparent that the collective bargaining agreement deprives the debtor of the flexibility it needs to achieve a reorganization. A merger or joint venture reorganization brings into conflict the collective bargaining agreement of the other carrier, its furloughed employees and a host of problems involving the seniority rules of debtor's collective bargaining agreement. Any prospective merger partner will be in the economic bargaining position to choose the tune to which the debtor must dance. Although the debtor's efforts toward reorganization through a joint venture agreement with PSA have come to a halt, because of the failure of one of the debtor's other unions (pilots) to reach an agreement to modify its collective bargaining agreement, it remains to be seen whether that will prove to be fatal. It is clear at this point, however, that any agreement with PSA or any other carrier for a merger or joint operating agreement is totally dependent upon a drastic restructuring of the debtor's various collective bargaining agreements. Indeed, the debtor's three other unions recognized this and voluntarily agreed to substantial modifications of their respective agreements. The debtor's request of the IAM has been no different than its request of the other unions. If there are going to be jobs for any of the former employees there must be a reorganization. The possibility of a reorganization through the debtor's entry into a different business venture such as engaging in base support operations for other carriers also requires the same drastic changes in the collective bargaining agreement. In the face of all of this the IAM has refused to renegotiate at least part of its agreement. I find the debtor's collective bargaining agreement with the IAM is burdensome and rejection of that

---

1. This is a statement of the cost to operate the debtors basic aircraft, the 727–200, calculated on the total number of seats, 149.

2. Average direct labor costs are a composite of the number of employees (which is a function of work rules) and levels of pay within various categories.

agreement is essential to assist the debtor in a reorganization which still appears to be a realistic goal.

Clearly, the members of the IAM will suffer a loss because of the difficulty in liquidating all of their intangible rights. Moreover these claims will fall into the mass of unsecured creditors. Counter balancing this is the fact that there will be no jobs if the agreement is not rejected. This is true for the members of the IAM as well as the other former employees of the debtor. Under the proposed PSA agreement approximately 162 of the IAM's 1800 members would be recalled to work. Some 1300 to 1800 jobs for other former employees also hang in the balance. Presumably some, but not all of the IAM's people who are not recalled will obtain employment elsewhere. Many will be forced to take lower paying jobs. But that is the result of the debtor's financial failure, not the rejection of the agreement. In the event of rejection, the sacrifices made by the union members who choose to work for lower pay will be less than the total economic loss to all other employees if rejection is not permitted. The monetary value of the union members' loss is insignificant when compared with the loss to all other creditors if no reorganization occurs. Seniority is important but it is difficult to understand the IAM's reluctance to yield to PSA employees on this issue. It is a basic principle that a job without seniority is better than no job at all.

All of these facts must be considered in the context of our national labor policy. Collective bargaining agreements are at the heart of relations between unions and industry. They provide stability and substitute reasoned negotiations for the use of raw power. It is in the public interest to promote industrial tranquility. On the other hand to deny rejection and thereby eliminate 1500 to 2000 jobs is counter productive to these policies. Having considered all of the equities I am of the opinion the balance tips decidedly in favor of allowing the debtor to reject the collective bargaining agreement with the IAM.