WILKINSON, Chief Judge,
concurring:
I write simply to express my reasons for voting to deny enforcement of that aspect of the Board’s order altering the salary increase agreed to by Fieldcrest and the union in the course of collective bargaining. A brief word of background is in order at the outset.
After Fieldcrest had raised non-union employees’ salaries by 5.5%, it entered into collective bargaining negotiations with the union over the appropriate rate at which union employees’ pay should be increased. Fieldcrest initially sought the figure of 4% and the union, 6%. As the negotiations progressed, Fieldcrest increased its figure to 4.25% and the union decreased its request to 5.5%, before they eventually agreed to 4.5%. In the end, therefore, the non-union employees received a 5.5% salary increase and the union employees, a 4.5% increase.
The Board, in its order addressing the 1% difference between the two pay increases, required that Fieldcrest make whole its union-represented employees by extending to them the 5.5% salary increase granted to non-union employees. It also ordered Field-crest to resume bargaining with the union over the “terms and conditions of employment.” As both of these remedies constitute improper attempts by the Board to influence the outcome of collective bargaining, they *75 exceed the Board’s power as outlined by the Act and by Supreme Court precedent. See H.K. Porter Co. v. NLRB, 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970); NLRB v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829-30, 96 L.Ed. 1027 (1952). Accordingly, that portion of the Board’s bargaining order relating to the salary differential between union and non-union employees cannot be enforced.
A.
Section 8(d) of the Act states that the obligation to bargain “does not compel either party to agree to a proposal or require the maWng of a concession.” 29 U.S.C. § 158(d). Pursuant to this section, the Supreme Court has consistently held that the Board shall not be allowed to influence the results of collective bargaining. This is because the “object of the Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions.” H.K. Porter, 397 U.S. at 103, 90 S.Ct. at 823. Accordingly, the Board cannot “directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.” American National, 343 U.S. at 404, 72 S.Ct. at 829.
The Board’s order that Fieldcrest extend the salary increase given to non-union employees to its union employees was improper. The Supreme Court rejected precisely such an order in H.K Porter, which was “the first time in the 35-year history of the Act that the Board [ ] ordered either an employer or a union to agree to a substantive term of a collective-bargaining agreement.” 397 U.S. at 106, 90 S.Ct. at 825. In that case, the Board found that the employer’s failure to agree to a union demand for union dues checkoff was not in good faith, and it ordered the company to grant the union’s request. The Supreme Court, however, held that the Board lacked the remedial authority under the Act to require the employer to accept any particular term: “while the Board does have power under the National Labor Relations Act to require employers and employees to negotiate, it is without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement.” Id. at 102, 90 S.Ct. at 823. In short, “the results of the contest” should be left to “the bargaining strengths of the parties.” Id. at 108, 90 S.Ct. at 826.
This circuit has followed H.K. Porter when facing circumstances similar to those presented here. In Clearwater Finishing Co. v. NLRB, 670 F.2d 464, 466 (4th Cir.1982), the company refused to agree to the union’s bargaining demand for a retroactive pay increase which had already been granted to non-union employees. The Board found that the company lacked good faith and required it to grant the retroactive pay increase to union employees. This court disagreed, explaining that “the Board’s order that the Company grant the proposed wage increase retroactively is beyond the scope of its authority as set out in H.K. Porter.” Id. at 468.
The Board in this ease similarly exceeded its authority. Here, as in Clearwater, the Board altered the terms of a pay raise, a substantive element of a collective bargaining agreement. Fieldcrest and the union had negotiated over a period of four months, and each had proposed at least three different figures for the pay increase. In fact, the Board’s order here is even more intrusive than the ones rejected in Clearwater and H.K. Porter. In this case, the parties actually had agreed to a pay raise of 4.5%. The Board thus did more than side with one party’s position in ongoing negotiations; it dictated a change to the pay raise already agreed upon by both parties. This, the Act clearly does not allow. H.K. Porter, 397 U.S. at 102, 90 S.Ct. at 822-23.
That portion of the Board’s order that would require Fieldcrest and the union to renegotiate the agreed-upon salary increase of 4.5% must likewise be rejected. As the Supreme Court explained in American National, “Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of labor agreements.” 343 U.S. at 408-09, 72 S.Ct. at 832. This would certainly be the result if the *76 Board could order the parties to renegotiate a term already agreed to by the parties during collective bargaining. Moreover, such an order is tantamount to dictating the terms of the agreement. The Act, of course, does not allow such a result. Id.; see also H.K. Porter, 397 U.S. at 102, 90 S.Ct. at 822-23.
B.
The Board, however, contends that its imposition of collective bargaining terms was justified because Fieldcrest’s offer of a 4.5% salary increase to the union lacked good faith. Section 8(d) of the Act requires that parties “confer in good faith with respect to wages, hours, and other terms and conditions of employment,” 29 U.S.C. 158(d), and negotiate “with the view of reaching an agreement if possible.” NLRB v. Highland Park Mfg. Co., 110 F.2d 632, 637 (4th Cir.1940); see also NLRB v. Katz, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113-14, 8 L.Ed.2d 230 (1962) (the parties shall not possess “a cast of mind against reaching agreement”). While Field-crest maintains that the existence of an actual agreement is itself proof that it entered into negotiations with the good faith intention of reaching agreement, the Board and the union offer various reasons for why this is not so. I shall address each of those arguments in turn.
1.
The Board contends that Fielderest’s record of unfair labor practices demonstrates that Fieldcrest did not intend to bargain in good faith with the union. While the Board is correct that courts have looked outside of the negotiations for activity indicative of “a cast of mind against reaching agreement,” Katz, 369 U.S. at 747, 82 S.Ct. at 1114; see Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1381 (8th Cir.1993), these cases involved attempts to ascertain whether the bargaining constituted a ‘“charade or sham [intended] to avoid reaching an agreement.’” Radisson, 987 F.2d at 1381 (quoting Continental Insurance Co. v. NLRB, 495 F.2d 44, 48 (2nd Cir.1974) (emphasis added)). Such inquiries, however, are pointless when the parties have already reached agreement. Here, the agreement itself proves the good faith of the parties: if the parties had no intention of reaching an agreement, no agreement would have been reached.
2.
The union maintains that the existence of an agreement cannot itself prove good faith because parties may reach an agreement in the absence of good faith. The union suggests that it conceded to Fieldcrest’s term merely so that it could litigate Fieldcrest’s bargaining position — and of course, so that it could give its workers an immediate wage increase of 4.5%. Essentially, the union claims that Fieldcrest lacked good faith because it had no future intention of continuing to bargain had the union rejected the 4.5% term. But we have no way of knowing what Fieldcrest would have done had the union either refused that offer or gone on strike. Violations of the Act cannot be based on speculation. While it is true that further delay in reaching a pay increase (or the initiation of a strike) might have undermined support for the union at Fieldcrest, a party may not use the courts to circumvent the collective bargaining process. After all, tough give-and-take is part of collective bargaining, and it was ultimately the union’s choice to accept the offer on the table or continue to negotiate.
3.
The union also contends that Fieldcrest’s failure to offer the 5.5% raise to union employees during the negotiations (or perhaps, even to use this figure as the starting point for the negotiations) demonstrates an absence of good faith. The Board itself has noted, however, that “regarding the grant of new benefits to unrepresented workers, the most that can be said is that the Act may impose on the employer the duty to bargain with respect to providing the new benefits to represented employees.” B.F. Goodrich Co., 195 N.L.R.B. 914, 915, 1972 WL 4283 (1972); see also H.K. Porter, 397 U.S. at 102, 90 S.Ct. at 822-23; Winn-Dixie Raleigh, Inc., 267 N.L.R.B. 231, 236, 1983 WL 24904 (1983).
The flaw in the union’s argument here is apparent when one considers the hypothetical opposite ease, where Fieldcrest attempts *77 to impose on the union the same pay increase granted to non-union employees. Had Field-crest, for example, given non-union employees a 3.5% pay increase, certainly Fielderest could not have unilaterally imposed that increase on the union; the union would have wanted the opportunity to bargain for the 4.5% raise. In fact, this was precisely what the union tried to accomplish here. The union initially sought not the 5.5% given to non-union employees, but rather, a higher salary increase, 6%.
While the union assumes that its employees will always be at least as well off as nonunion employees, collective bargaining entails the risk that they will be worse off. Presumably, when employees vote for union representation, they are making a prediction that more often than not, they will be better off. But certainly, there is no guarantee that this will be true in every case. As the Supreme Court explained in H.K Porter:
the Act as presently drawn does not contemplate that unions will always be able to secure and achieve agreement even when their economic position is weak, or that strikes or lockouts will never result from a collective bargaining impasse. It cannot be said that the Act forbids an employer or a union to rely ultimately on its economic strength.
397 U.S. at 109, 90 S.Ct. at 826.
The union’s failure to obtain its desired increase of 6% was ultimately the consequence of its lack of economic strength. In recent years, the percentage of unionized employees at Fielderest had decreased from 65% of its employees to less than 25%. Moreover, the union had agreed to salary increases of 4%-4.5% from Fieldcrest’s competitors. Most importantly, though, the union publicly disavowed the viability of a strike and even promised Fieldcrest’s employees that it would not strike. Given these circumstances, the threat of a strike was no longer credible, and the realities of the bargaining process determined the ultimate result.
4.
The Board also contends that the good faith inquiry must include the underlying motivation for reaching an agreement. For instance, if Fieldcrest’s motive for pursuing the 4.5% term included the desire to undermine the union, the Board would presumably find an absence of good faith. Again, while evidence of such motives might be useful to prove the existence of a “ ‘charade or sham [intended] to avoid reaching an agreement,’ ” Radisson, 987 F.2d at 1381 (quoting Continental Insurance Co., 495 F.2d at 48 (emphasis added)), the parties reached agreement here.
Moreover, the Board’s assumption that certain motivations somehow invalidate collective bargaining agreements is a questionable one. Consider Fieldcrest’s potential motives for the salary differential: discouraging unionization at its other plants; taking advantage of the union’s unusually weak bargaining position; recompensating its coffers for previous pay increases to union employees; saving funds in anticipation of future pay increases; or giving union employees a lower pay increase than non-union employees because union members receive other costly benefits (benefits that non-union employees may not receive). All of these are merely aspects of the same overarching motive that always controls the company’s position: the maximization of profit. As the Seventh Circuit explained, the company that does “whatever it can to maximize its profits by minimizing its labor costs invites a test of strength with its unions. It does not commit an unfair labor practice.” Graphic Communications International Union v. NLRB, 977 F.2d 1168, 1171 (7th Cir.1992).
The union’s varied motivations for seeking a 6% pay increase appear equally irrelevant to the validity of the bargaining. Perhaps the union sought to one-up the non-union pay raise to further its campaign at Fieldcrest’s other facilities and thus to enlarge its membership. Is it an absence of good faith for a union to want more than what the company considers a “fair” pay increase? Of course not. Whatever the union’s underlying mo-tivéis) may have been for seeking 6%, the union was merely attempting to improve the condition of its membership.
*78 It is precisely this fundamental conflict between the rational interests of the company and those of the union that necessitates collective bargaining in the first place. And ultimately, so long as the parties are actually bargaining (and no charade exists), one need not be concerned about various motives affecting the negotiations — the ultimate agreement will always reflect the parties’ legitimate bargaining strength. As reliance on one’s bargaining strength was precisely what Congress intended when it passed the Act, this cannot substantiate the absence of good faith. H.K. Porter, 397 U.S. at 108, 90 S.Ct. at 826.
In sum, the Board should have respected the outcome of the collective bargaining process.