Wray B. FARNER, Marian Fitzgerald, Dorothy Alice Crowe, Roy E. May, Dorothy G. Southard, Plaintiff-Appellants,

v.

Wray F. FARNER, Wray F. Farner, Executor of the Will of Carl J. Farner, Deceased, Robert May, Melvin May, Defendant-Appellees.

No. 2–784A197.[1]

Court of Appeals of Indiana, First District.

July 17, 1985.

---

1. This case diverted from the Second District by order of the Chief Judge.

Thomas L. Williams, William C. Burns, Schultz, Ewan, Burns & Heid, Lafayette, for plaintiff-appellants.

George L. Hanna, Eric H. Burns, Hanna & Gerde, Lafayette, for defendant-appellees.

NEAL, Judge.

### STATEMENT OF THE CASE

Plaintiff-appellants, Wray B. Farner (Mike), Marian Fitzgerald, Dorothy Alice Crowe, Roy E. May and Dorothy E. Southard, appeal from a negative judgment of the special judge presiding in the Tippecanoe Circuit Court in their action to contest the will of Carl J. Farner (Carl), which action was brought against Wray F. Farner (Bub) as sole beneficiary and executor of the will, Robert May and Melvin May. We affirm.

### STATEMENT OF THE FACTS

Carl died on January 27, 1981 at the age of 84 years, leaving no spouse, children or parents surviving. At his death, Carl had seven heirs at law: Mike, his brother; Marian Fitzgerald and Dorothy Alice Crowe, the daughters of his deceased brother Marion; and Robert May, Melvin May, Roy E. May and Dorothy Southard, the children of his deceased sister LaFerne May. If Carl had died intestate, Bub would have received nothing as his father, Mike, survived Carl. On February 15, 1973 Carl executed his Last Will and Testament, in which he named his nephew, Bub, as executor and sole beneficiary. This will was admitted to probate in the Tippecanoe Circuit Court following Carl's death and Bub was appointed executor of the estate.

Carl was born and resided in Indiana until he joined the U.S. Navy at the age of twenty. In 1947, Carl, then fifty, retired from the Navy and made his home in San Diego, California. He was a healthy, active member of his community until 1964, when he underwent surgery for a ruptured aorta. Although he recovered well from surgery, Carl's physical activity became

more limited thereafter; however, generally he was still alert and active for a man of sixty-seven. His nieces, Marion Fitzgerald and Dorothy Crowe, said he seemed somewhat slower and more easily irritated.

Soon after his surgery, Carl and his wife dissolved their marriage and Carl moved into an apartment by himself. After his divorce, Carl began to visit his family in Indiana more often. Throughout most of his life he had stayed in contact with his nieces and nephews, however, Carl had not spoken to his only living brother, Mike, since 1947.

From the late 1960's until 1972, Carl drove his own automobile to Indiana frequently and developed the habit of staying with Bub and his family. Carl made Bub's home his "base of operations" and would then visit with his other nieces and nephews, but not with Mike. After making the trip from California to Bub's in the spring of 1972, Carl decided he could no longer drive and gave his 1964 Ford to Bub and his wife. Also that spring Bub convinced Carl to visit with Mike, but this did not serve to improve their relationship, which had been strained and bitter for 25 years.

Carl left Indiana by bus and stopped in Oklahoma to visit a first cousin, Pauline Landes, for a few days on his way to California. Pauline said Carl seemed competent and self-sufficient at that time in 1972. She found him to be jovial and interested in people and the world, as he had always been. At this time, and during a prior visit in 1970, Carl expressed his wish that Bub receive his property upon his death as he was very fond of Bub and his wife, and believed they could use the financial assistance to raise and educate Bub's three sons. Later that summer while visiting a nephew by marriage, Gerald Sutherland, Carl repeated his intention to leave everything to Bub, mentioning his other relatives by name and explaining why they were to receive nothing.

Carl returned to Bub's home in Indiana during the fall of 1972 and for Christmas that year. Less than one month later, in January of 1973 Carl took a bus back to Bub's and stayed there until February 17, 1973. On February 13 Bub drove Carl to the office of David Crouse, an attorney at law, for the purpose of making Carl's Last Will and Testament. Outside the presence of Bub, Carl discussed with Crouse the extent of his property, the identity of his bank accounts and his desire to leave everything to Bub, who was also to be the executor of his estate. Crouse drafted a will to accomplish this. Crouse testified that Carl appeared to be of sound mind to make a will; that he understood what his property included and who his relatives were, both on February 13 and February 15 when Carl returned to his office to execute his will. On the 15th, also outside Bub's presence, Crouse read the will he had drafted for Carl with him and explained it to him. Carl reiterated his wish that Bub receive all of his property at his death, whereupon he signed and executed the will drafted by Crouse in the presence of Crouse and his secretary as subscribing witnesses.

Two days after executing his will, Carl left Indiana by bus en route to California. Although the exact dates are in confusion, soon after Carl arrived in San Diego he was taken by authorities to a Veteran's Administration (V.A.) Hospital in a disoriented and confused state. The hospital engaged the Adult Protective Services Agency (Agency) to assume responsibility for Carl's care, and it placed him in a private boarding house where he remained until March 2, 1973. Following a dispute with a fellow boarder there, and a few subsequent short moves, Carl was admitted to an institution in National City, California; Hillcrest Manor. There, Carl's condition was diagnosed as "organic brain syndrome, secondary to cerebral arteriosclerosis". Carl was agitated and unhappy with institutional life at Hillcrest, but remained there until March 26, 1973, when Bub flew to California to make arrangements for him to return to Indiana.

Before leaving for Indiana, Bub accompanied Carl to Silver Gate Savings and Loan in San Diego, where Carl had two

accounts. One of these accounts was a term account which Carl had deposited as a joint account with Bub, unbeknown to Bub. This account was left with Silver Gate but the other account, a regular savings account, was closed out. The balance of this account, minus airfare to Indiana, was deposited by Carl in a joint account with Bub at an Indiana bank the following day.

Also on March 27, Bub took Carl to the V.A. Hospital in Marion, Indiana where he was to reside until his death in 1981. Carl was 76 years old when admitted and was diagnosed as having "psychosis with cerebral arteriosclerosis", a slowly degenerative condition. His physical health was generally consistent with his age but his mental state fluctuated. Although there were times when Carl was alert and outgoing, as he had been in his early life, there were also occasions when he was confused, irritable and inappropriate in his behavior. Bub and Gerald Sutherland often visited Carl in the hospital between 1973 and 1976, and testified Carl remained alert and interested in the world around him until sometime in 1975. During the first three years of his stay at the Marion V.A. Hospital, Carl was allowed to leave the grounds to take recreational trips with Bub and his family. He also remained self-sufficient in regard to his personal needs during this period. But Carl's condition continued to deteriorate and from 1976 until his death he was bedridden and did not recognize his family.

## ISSUES

Mike and the other appellants list several issues which, as restated, are:

I. Whether the appellants, who are appealing a negative judgment which was rendered on the record and transcript of the evidence, are entitled to have the appellate court reweigh the evidence on appeal.

II. Whether the trial court's judgment is contrary to law or whether the findings of fact are supported by the record.

III. Whether the appellants satisfied their burden of proving Carl was of unsound mind to execute a will in February of 1973.

IV. Whether the trial court erred in admitting the testimony of Gerald Sutherlin, a lay minister of the Lutheran Church, as to conversations he had with Carl and his opinion as to Carl's competency.

V. Whether the trial court erred in admitting the testimony of Pauline Landes and Gerald Sutherland as to statements made to them by Carl prior to the execution of his will regarding his intended disposition of his property.

VI. Whether the appellants satisfied their burden of proving Carl executed his will under undue influence.

VII. Whether the trial court erred in refusing to grant a new trial on the basis of newly discovered evidence consisting of an outpatient card from a San Diego V.A. Hospital allegedly dated February 16, 1973.

## DISCUSSION AND DECISION

This cause was heard and transcribed by the Tippecanoe Circuit Court. Pursuant to Ind.Rules of Procedure, Trial Rule 53.1 and 53.2 a special judge was appointed to render a decision based on the stipulated record and transcript of the evidence without hearing any new evidence. Appellants contend this situation creates an unlimited scope of appellate review, as we are in the same position as the trial court to judge the evidence from the cold record.

We first note the burden of proof in a will contest is on the opponent of the will. IND.CODE 29-1-7-20; *Hinshaw v. Hinshaw*, (1962) 134 Ind.App. 22, 182 N.E.2d 805. Thus, at the trial court level appellants had the burden of proof on the issues they raised; undue execution, undue influence and unsound mind to create a valid will. The special judge found they

had not satisfied their burden and entered a negative judgment, which is reversible only upon an error of law. *Arnold v. Parry,* (1977) 173 Ind.App. 300, 363 N.E.2d 1055. Appellants now want this court to retry the matter. This we cannot do. *See Hudelson v. Hudelson,* (1905) 164 Ind. 694, 74 N.E. 504; *Parkison v. Thompson,* (1905) 164 Ind. 609, 73 N.E. 109.

Appellants rely on *Stockwell v. Bloomfield State Bank,* (1977) 174 Ind.App. 307, 367 N.E.2d 42 which cites *Farmer & Merchants State Bank v. Feltis,* (1971) 150 Ind.App. 284, 276 N.E.2d 204 and *Indiana Bank & Trust Co. v. Lincoln National Bank,* (1965) 137 Ind.App. 546, 206 N.E.2d 879, for the statement, "It is the law in Indiana that when a judgment is rendered entirely on documents or stipulations, the appellate courts are in an equal position with the trial court in determining the weight of the evidence on appeal." 367 N.E.2d at 44.

*Stockwell* is the only Indiana case under T.R. 53.2, as rewritten in 1983, wherein the trial judge who heard the evidence was disqualified and a successor judge appointed to rule on the transcript of the evidence. *Feltis, supra* and *Indiana Bank & Trust, supra,* cited by *Stockwell* were decided upon pure stipulations of fact agreed on by the parties. These cases, as well as *Gorby v. McEndarfer,* (1963) 135 Ind.App. 74, 191 N.E.2d 786; *Sullenger v. Baecher,* (1913) 55 Ind.App. 365, 101 N.E. 517; and *State ex rel. Davis v. Board of Commissioners,* (1905) 165 Ind. 262, 74 N.E. 1091, all concur that an appellate court may not weigh either oral or written evidence, but where a case is tried wholly upon documents or stipulations, the appellate tribunal is in as good a position as the trial court to determine the *force and effect* of the evidence.

We perceive a grave difference between cases such as those cited above, which are decided upon documents or particular facts which the parties stipulate to be true, and here, where the trial court is asked to rule on the cold transcript of an entire tried and contested case which the parties stipulate to be the record of the evidence. We find no statutory directive as to the role of the special judge [2] in accepting a case pursuant to T.R. 53.2, or our position upon review of a judgment so rendered, and therefore look to case law for guidance.

■■■ The circumstances presented here more closely resemble the case where evidence is heard by a trial judge who thereafter dies or resigns from office before making findings or ruling on the evidence. The general rule in such case is that a successor judge may not make findings of fact or conclusions of law without a trial *de novo. Macy v. Logansport Mach. Co.,* (1951) Ind.App., 101 N.E.2d 715. *See generally* 54 A.L.R. 952 (1928); 22 A.L.R.3d 922 (1968). This is because "[a] party to an action is entitled to a determination of the issues by the jury or judge that heard the evidence". *See Dawson v. Wright,* (1955) 234 Ind. 626, 129 N.E.2d 796; *State ex rel. Harp v. Vanderburgh Circuit Court,* (1949) 227 Ind. 353, 85 N.E.2d 254; *Wainwright v. P.H. & F.M. Roots Company,* (1912) 176 Ind. 682, 97 N.E. 8; 17 I.L.E. *Judges* Sec. 10 (1959); 48 C.J.S. *Judges* Sec. 56(b) (1947). *See also Addison v. Review Board of the Indiana Employment Security Division,* (1979) Ind.App., 397 N.E.2d 1037; *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.,* (1978) Ind.App., 372 N.E.2d 742. In a case where the resolution of a material issue requires a determination as to the weight and credibility of testimony, due process requires that the trier of fact hear all of the evidence necessary to make a meaningful evaluation. *Addison, supra.* However, we find that like other elements of due process, this right may be waived. Thus, when the trial judge who heard the testimony and observed the demeanor of the witnesses at trial is unavailable to render a decision

---

**2.** Ind.Rules of Procedure, Trial Rule 63(A) applies specifically to post-trial motions and judges pro tempore. *See* Annot., 22 A.L.R.3d 922, 945 (1968). *But see Pre-Finished Moulding & Door, Incorporated v. Insurance Guidance Corporation,* (1982) Ind.App., 438 N.E.2d 16. *Cf.* Ohio Civ.Rule 63(A).

thereon, the parties may stipulate that the substitute judge should determine the case on the record. *Thomas-Bonner Co. v. Hooven, Owens & Rentschler Co.,* (6th Cir. 1922) 284 Fed. 386; *Sunset Irrigation District v. Ailport,* (1974) 166 Mont. 11, 531 P.2d 1349; *Christopher v. Nelson,* (1973) 50 Mich.App. 710, 213 N.W.2d 867; *Perez v. Perez,* (1952) 111 Cal.App.2d 827, 245 P.2d 344; *Worden v. Alexander,* (1939) 108 Mont. 208, 90 P.2d 160; *McAllen v. Souza,* (1937) 24 Cal.App.2d 247, 74 P.2d 853; *Hughes v. DeMund,* (1929) 96 Cal.App. 365, 274 P. 405; *In re Nolan,* (1906) 71 N.J.Eq. 207, 63 A. 618; *In re Sullivan,* (1904) 143 Cal. 462, 77 P. 153. *But see Welsh v. Brown-Graves Lumber Company,* (1978) 58 Ohio App.2d 49, 389 N.E.2d 514; *Moore Golf, Inc. v. Lakeover Golf and Country Club, Inc.,* (1975) 49 A.D.2d 583, 370 N.Y. S.2d 156 (holding parties may not so stipulate where questions of credibility are involved); *Bradford v. Fountain Marine Construction Company,* (1966) 182 So.2d 447. In such case, the substitute judge "becomes clothed with all the jurisdiction and authority which originally resided in [his predeceasor]". *Christopher, supra,* 213 N.W.2d at 868; *Thomas-Bonner, supra.*

▪ This, it seems, must also be the approach taken under T.R. 53.2. We see no reason why the special judge may not weigh the evidence when deciding a case on the record when such has been stipulated by the parties. This is a common practice in cases tried upon depositions and retrials where testimony from the first trial is read into evidence. Likewise, the special judge's decision must have the same force as a like ruling by the original judge would have, including the determination of factual questions embraced by the issues. *See Thomas-Bonner, supra.* Unless this is the result the purpose of invoking T.R. 53.2 and stipulating the record, as opposed to employing T.R. 58, would be defeated. All parties involved must feel secure that the decision which they have agreed should be rendered by the special judge will be honored as any other ruling by a trial court.

▪ Appellants urge us to discount the special judge's ruling here simply because it was rendered on the cold transcript. Although we agree that we are in an equal position to determine the effect of the evidence, we cannot conduct a trial *de novo. Christopher, supra.* Appellants moved to have submission of this cause withdrawn from the original judge and agreed to submit it to the special judge for determination on the record. They may not now be heard to complain that the result reached by the special judge should be accorded no consideration upon review.

▪ We may not weigh evidence, even where the case is tried upon the cold record. *See Gorby, supra; Mannos, supra;* Art. 1, Sec. 20 Constitution of Indiana. In *Christopher, supra,* the Michigan Court of Appeals upheld a negative judgment entered by a successor judge who found the plaintiff contributorily negligent based on his examination of the cold trial transcript. Rejecting the appellants plea that its review should be *de novo,* the court stated, "Ascribing the rule-directed test to the [special] judge's findings of fact we examine them to determine, not whether we would have reached the same result, but rather whether his findings of fact were clearly erroneous". 213 N.W.2d at 868. *See* Ind.Rules of Procedure, Trial Rule 52(A)(3); *Nolan, supra.* We will look to the record only to determine whether the undisputed evidence entitled appellants to a judgment which was denied them. If so, the special judge's ruling was contrary to law and must be reversed. *Hinds, Executor v. McNair,* (1955) 235 Ind. 34, 129 N.E.2d 553.

Insofar as *Stockwell, supra,* stated we may weigh the evidence in an appeal from a judgment rendered pursuant to T.R. 53.2, it is overruled. However, we note that the appellate court in Stockwell did not reweigh the evidence in reaching its decision.

Issues II through VI will be discussed together, as our evaluation of the evidence under III, VI, V and VI leads to our conclusion under II.

■ Every person is presumed to be of sound mind to execute a will until the contrary is shown. *Blough v. Parry,* (1895) 144 Ind. 463, 40 N.E. 70. Only where the testator lacks mental capacity at the time of executing the will to know (1) the extent and value of his property; (2) those who are the natural objects of his bounty; and (3) their deserts, with regard to their treatment of and conduct toward him, will the law in Indiana invalidate a will. *Hinshaw v. Hinshaw,* (1962) 134 Ind. App. 22, 182 N.E.2d 805. If the testator is of sound mind to execute his will at the time he does so, it is immaterial what may have been his condition at some other time. *Peters v. Knight,* (1937) 103 Ind.App. 453, 8 N.E.2d 401. Although evidence of the testator's mental condition prior to and following the date of execution is admissible, such is relevant only as evidence of his mental state when making the will. *Bundy v. McKnight,* (1874) 48 Ind. 502; *Bell v. Bell,* (1940) 108 Ind.App. 436, 29 N.E.2d 358.

■ Nor is all mental weakness or infirmity enough to set aside a will. The testator may not be in full possession of his reasoning powers and his memory may be slightly obscured or clouded, but if the above conditions are met, his will is deemed valid. *Bundy, supra; Noyer v. Ecker,* (1954) 125 Ind.App. 63, 119 N.E.2d 902. The mere fact the testator was of unsound mind when the will was executed is not enough to invalidate the will if it did not affect his making of the will and disposition of his property. *Ramseyer v. Dennis,* (1917) 187 Ind. 420, 116 N.E. 417. As stated in *Bundy,* "Case upon case can be cited which go to the extent of deciding that unless the failure of understanding be quite total, reaching to the testator's forgetfulness of his immediate family and property, he is not disqualified from making a will", for the weak and aged must be accorded the same rights as the strong-minded to dispose of their property. 48 Ind. at 514, citing *Morris v. Stokes,* (1857) 21 Ga. 552. We agree that

"... testamentary capacity is consistent, especially in very aged persons, with a great degree of mental infirmity, and some degree of mental perversion or aberration, at times, provided there is satisfactory proof that the testator, at the time of the execution of his will, really did comprehend its import and scope, and was not under the control of any improper or undue influence, or of any deception or delusion."

*Bundy* 48 Ind. at 514.

■ In the present case, the trial court found Carl, at 76, was competent to make a will at the time he did so in early 1973. The court acknowledged that Carl was sometimes uncharacteristically confused and irritable but his condition was commensurate with his age. These findings are supported by the evidence. The attorney who drafted Carl's will testified when he met with him, Carl understood what his property included and indicated who his relatives were. On both the day the will was drafted and the day it was executed Carl expressed his desire that Bub receive everything. There was documentary and oral evidence Carl's mental state fluctuated following the execution of the will but he was considered competent as late as 1975.

■ Appellants claim their medical evidence of Carl's mental deterioration and inconsistent personality, accumulated while he was hospitalized in the various V.A. Hospitals, shifts the burden of proof to Bub to show Carl was of sound mind to execute a will. Although the rule is proof of unsoundness of mind of a permanent nature raises an inference that such condition continues until the contrary is shown, we cannot carry this inference back where no evidence was entered of incompetence before the execution of the will. *See Branstrator v. Crow,* (1903) 162 Ind. 362, 69 N.E. 668. Physicians testifying for appellants had only examined and treated Carl following the execution of his will and could only state Carl's condition was one of slow deterioration and "most likely" existed in the early 1970's. This alone is not enough to support a presumption that Carl

was not of sound mind on February 15, 1973. Moreover, no evidence was entered of specific behavior on Carl's part which would indicate he did not know the extent of his property, his relatives and ·their needs and just deserts prior to 1973. In fact, all of the evidence on this point supports the trial court's finding of competency.

Appellants argue testimony of Pauline Landes and Gerald Sutherland as to Carl's statements regarding his intended disposition of his property was inadmissible. The rule is that it is proper to consider any declaration made by the testator prior to making his will, in regard to the disposition he intends to make. And if it should be found that when he was of sound mind and in good health, he declared his intention to dispose of his property substantially in the same manner it is disposed of in the will in suit, it is an important fact to be considered in determining the validity of this will and as tending to its support. *Lamb v. Lamb,* (1885) 105 Ind. 456, 5 N.E. 171; *Bundy, supra.* The statements of Carl to Pauline and Gerald, which expressed his desire that Bub receive everything, go to Carl's mental soundness when executing his will. *Lamb.* There is case law supporting the notion that they may even be considered as rebuttal to a claim of undue influence. *Goodbar v. Lidikey,* (1893) 136 Ind. 1, 35 N.E. 691; *But see Conway v. Vizzard,* (1889) 122 Ind. 266, 23 N.E. 771; *Bundy, supra.* "Where the will is made in conformity with the repeated declarations of the testator, it is more likely to have been executed without undue influence than if found contrary to such declarations." 136 Ind. at 8, 35 N.E. 691. The testimony of Gerald as to a conversation with Carl late in 1972 is especially enlightening as Carl not only expressed his desire that Bub take everything but also explained why he was leaving nothing to his other family members.

The fact Gerald later became a lay minister does not change the admissibility of his testimony, which does not pertain to confessions made by Carl. *Buuck v.*

*Kruckeberg,* (1950) 121 Ind.App. 262, 95 N.E.2d 304; IND.CODE 34-1-14-5. Carl spoke to Gerald as a friend and relative and Gerald's testimony as to observations made from conversations had with Carl after he became a lay minister, while Carl was in the Marion V.A. Hospital, are also competent evidence supporting Carl's continuing mental soundness after the will was executed. We agree with the trial court that appellants did not meet their burden of proving Carl was of such unsound mind on February 15, 1973, that his will executed on that date is invalid.

Nor do we find evidence of undue influence. We first note appellants emphasize alleged behavior of Bub which is in no way connected to Carl's execution of his last will and testament. They refer to Bub as "the influencer exploiting a relationship of trust" and insinuate he coerced Carl to meet with his attorney and draw up a will disinheriting them.

The exercise of undue influence is never presumed. *Folsom v. Buttolph,* (1924) 82 Ind.App. 283, 143 N.E. 258. In determining this issue, the real question must be as to the mental soundness of the testator; whether his mind was in fact unduly influenced in the making of his will. *Goodbar, supra.* Advice, persuasion and other influences by family will not vitiate a will so long as the "free agency" of the testator to act has not been interfered with. *Folsom; Bundy, supra.* It must·be such as to "control the mental operations of the testator in the making [of his will], overcome his power of resistance and oblige him to make a disposition of his property which he would not have made if left freely to act according to his own wishes and pleasures." *Lindinger v. Lindinger,* (1955) 126 Ind.App. 463, 130 N.E.2d 75. There is no evidence Carl and Bub ever discussed the terms of Carl's will and both Bub and the attorney who drafted and witnessed the will testified Bub was not present when Carl executed it. *See Willett v. Hall,* (1942) 220 Ind. 310, 41 N.E.2d 619.

Appellants agree Carl became very close to Bub and his family during the latter part of his life and that Bub took care of Carl. Contrary to appellants' view of this kinship, the presumption in favor of a will's validity should be increased, not diminished, by the fact a bequest was made to one with whom the testator maintained an intimate and confidential relationship. *Willett v. Hall,* (1942) 220 Ind. 310, 41 N.E.2d 619; *Goodbar, supra.* The fact Carl left all of his property to his nephew who had befriended him in his mid-sixties and whom he believed to be in financial straits; as opposed to other, better off kin whom he disliked or saw infrequently, supports the presumption Carl was of sound mind and acted as a free agent when he executed his will. *See Goodbar; Lamb, supra.* Undue influence is to be determined in light of what the testator desired. *Lindinger, supra.* We cannot say appellants offered any competent evidence of probative value on the issue of undue influence and therefore the trial court properly found they did not satisfy their burden of proof.

For the above stated reasons we hold that the trial court properly found and ruled appellants, as opponents of the will, did not sustain their burden of proof on any issue which would invalidate the will. They did not overcome the presumption of the testator's sanity and did not show how Carl's mind was unduly influenced in leaving them nothing. Consequently, the trial court's negative judgment is not contrary to law.

 Nor did the trial court err in refusing to grant a new trial based on newly discovered evidence. Appellants allege the discovery of an outpatient treatment card from a San Diego V.A. Hospital, with an illegible date which they claim is February 16, 1973, shows Carl was in need of treatment the day after he supposedly executed his will in Lafayette, Indiana. Even if this card bears the date of February 16, it is merely cumulative evidence that Carl, at the age of 76, had some medical problems; or, it is an attempt to impeach the testimony of Bub and the attorney who drafted Carl's will that he executed it on February 15. The denial of a new trial was proper, as it would not lead to a different result. *Cua v. Ramos,* (1982) Ind., 433 N.E.2d 745.

For all the above stated reasons, we affirm the trial court's decision upholding the Last Will and Testament of Carl Farner, as it was executed on February 15, 1973.

Judgment affirmed.

RATLIFF, P.J., and ROBERTSON, J., concur.