# FOR PUBLICATION



ATTORNEYS FOR APPELLANTS:

**RICHARD M. DAVIS**
**KEVIN G. KERR**
Hoeppner Wagner & Evans LLP
Valparaiso, Indiana

ATTORNEY FOR APPELLEES:

**PAUL T. BERKOWITZ**
Paul T. Berkowitz & Associates, Ltd.
Chicago, Illinois

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ENGINEERED STEEL CONCEPTS, INC., | ) | |
| ESC GROUP LIMITED, and TOM ANDERSON, | ) | |
| | ) | |
| Appellants-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 45A04-1106-CT-287 |
| | ) | |
| GENERAL DRIVERS, WAREHOUSEMEN, | ) | |
| AND HELPERS UNION LOCAL 142, | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, and STEVEN PARKS, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Jeffrey J. Dywan, Judge
Cause No. 45D11-1010-CT-191

**February 29, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Engineered Steel Concepts, Inc. ("ESC"), ESC Group Limited ("Group") (collectively, "the Company"), and Tom Anderson appeal the trial court's dismissal of their complaint against General Drivers, Warehousemen, and Helpers Union Local 142, the International Brotherhood of Teamsters (collectively, "the Union"), and Steven Parks. Anderson and the Company raise three issues for our review, but we need only address the following dispositive issue: whether the trial court properly dismissed their complaint for lack of subject matter jurisdiction. We affirm.

## FACTS AND PROCEDURAL HISTORY

The relevant facts stated in the complaint are as follows:

1.      [Anderson] is the owner of [ESC] and [Group].

2.      ESC and Group are both entities that have, at times, engaged in the business of hauling various items and commodities, including recyclable by-products of the steel-making process.

3.      [The Union] is the local chapter of a national union representing laborers in a variety of industries.

4.      [Parks] is, and at all relevant [times] was, the business agent for [the Union].

* * *

6.      Among [Parks'] job duties as business agent was negotiating collective bargaining agreements between the Union and various employers.

7.      In October 2004, ESC purchased 100,000 tons of "c-fines," a by-product of the steel[-]making process, from International Steel Group.

* * *

2

9. At the time ESC purchased the c-fines, it did not employ any drivers or own any trucks.

10. On March 8, 2005, [Anderson] and Martin Surdell, as representatives of ESC, met with [Parks] to discuss the possibility of [ESC] entering into a contract to employ Union members to drive the trucks hauling the c-fines.

\* \* \*

12. At the . . . meeting, Anderson described the scope of the work to be performed . . . .

13. Anderson also informed [Parks] that the c-fines hauling project was temporary in nature[ ] and that Anderson expected the project to last about one year.

14. [Parks] stated to Anderson that there were two types of labor agreements applicable to the type of work Anderson described: a general construction agreement and a commodity hauling agreement.

15. [Parks], on behalf of [the Union], informed Anderson that, based on the scope and type of the work described by Anderson, a Section 8(f) general construction agreement, applicable to employers "engaged primarily in the building and construction industry," was the proper labor agreement for ESC to sign with respect to the c-fines project. See 29 U.S.C. § 158(f) (2006).

16. [Parks] stated to Anderson that the Section 8(f) agreement covered stockpile[-]to[-]stockpile movement of material, and informed Anderson that the c-fines hauling project qualified as a stockpile[-]to[-]stockpile movement project.

17. [Parks] informed Anderson that ESC could not sign a Section 9(a) commodity hauling agreement[] because ESC had no employees at the time the agreement would be signed.

18. [Parks] also stated to Anderson that it would be "illegal" for ESC to sign a Section 9(a) agreement because ESC had no employees.

19. Anderson informed [Parks] that ESC would not sign a contract with the Union unless the contract could be terminated at the completion of the c-fines hauling project.

3

20.     . . . [Parks] stated to Anderson three (3) times that the Section 8(f) agreement could be terminated when the c-fines hauling project was complete.

21.     [Parks] also told Anderson that ESC would need to sign a new Section 8(f) agreement if the c-fines project was not completed by May 31, 2006, the contract termination date specified in the Section 8(f) agreement tendered by Parks.

22.     . . . Anderson had no reason to believe that [Parks'] statements . . . contained misrepresentations of fact or were false.

23.     Anderson, in reasonable reliance on [Parks'] statements . . . , executed the Section 8(f) agreement tendered by [Parks].

* * *

28.     Following the completion of the c-fines hauling project in early February 2006, ESC informed [the Union employees] that the project was completed and no additional work was available.

29.     On or about March 13, 2006, [the Union] filed a charge against ESC with the National Labor Relations Board [("NLRB")] . . . alleging [the employees] were unjustly terminated.

30.     Following an investigation by the NLRB, the case against ESC was tried in February 2007, and Administrative Law Judge Eric M. Fine [("the ALJ")] issued a ruling that ESC and Group (as ESC's alter ego) had violated Sections 8(a)(1), (3), and (5) of the National Labor Relations Act [("the Act")], by laying off and terminating [the Union employees] in February and March 2006.

31.     [The ALJ] held that ESC and Group did not qualify as employers engaged primarily in the building and constructions industry, and that the scope and nature of the c-fines hauling project did not fit within the stockpile[-]to[-]stockpile definition in the Section 8(f) agreement.

32.     [The ALJ] held that the agreement signed by ESC should be treated as a Section 9(a) agreement, under which ESC could not terminate the agreement at the end of the c-fines hauling project.

33.     During the trial before [the ALJ], [Parks] testified untruthfully regarding the details of the March 8, 2005, meeting . . . .

4

34.    [Parks'] perjury during the administrative trial was suborned by NLRB counsel . . . , who either knew or reasonably should have known that she was eliciting false testimony from Parks in support of the NLRB's arguments.

\* \* \*

37.    [The ALJ's] ruling was affirmed by the [NLRB] on May 30, 2008.

Appellants' App. at 12-17.

Anderson and the Company then alleged three counts against Parks and the Union. Specifically, Anderson and the Company alleged Parks and the Union made material misrepresentations of fact at the March 8, 2005, meeting and thereby engaged in fraud. Likewise, Anderson and the Company alleged that Parks and the Union committed fraud in the inducement of the Section 8(f) contract. Third, they alleged that Parks and the Union engaged in intentional deception "regarding the propriety and details of the Section 8(f) agreement . . . ." Id. at 21. Anderson and the Company then requested the following relief:

> WHEREFORE, Plaintiffs pray for a judgment that Defendants Union and Parks, individually and as agent for Union, be required to compensate Plaintiffs for actual damages, including any amounts Plaintiffs are ordered to pay [by the NLRB to the discharged Union employees and the Union], for punitive damages, for costs of this action, for attorney fees in defense of the NLRB charges, and for all other relief that is just and proper in the premises.

Id. (emphases added).

Thereafter, in early December of 2010 Parks and the Union filed a motion to dismiss the complaint pursuant to, among other things, Indiana Trial Rule 12(B)(1). Attached to their motion and memorandum in support were the Union's charges against the Company filed with the NLRB; the NLRB's complaint and notice of hearing against

5

the Company; the NLRB's decision adopting the ALJ's findings and conclusions in favor of the Union; an order of the United States Court of Appeals for the Seventh Circuit enforcing the NLRB's decision; an e-mail exchange between the Company's attorney and counsel for the NLRB; and citations to and selected quotes from various federal statutes. Anderson and ESC filed a timely response. On May 11, 2011, the trial court granted the motion to dismiss under Rule 12(B)(1) for lack of subject matter jurisdiction.[1] This appeal ensued.

## DISCUSSION AND DECISION

Anderson and the Company appeal the trial court's grant of Parks and the Union's motion to dismiss the complaint for lack of subject matter jurisdiction. As our supreme court has held:

> In ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court may consider not only the complaint and motion but also any affidavits or evidence submitted in support. Indiana Dep't of Highways v. Dixon, 541 N.E.2d 877, 884 (Ind. 1989); Borgman v. State Farm Ins. Co., 713 N.E.2d 851, 854 (Ind. Ct. App. 1999), trans. denied. In addition, the trial court may weigh the evidence to determine the existence of the requisite jurisdictional facts. Borgman, 713 N.E.2d at 854.
>
> * * *
>
> [T]he standard of appellate review for Trial Rule 12(B)(1) motions to dismiss is . . . a function of what occurred in the trial court. That is, the standard of review is dependent upon: (i) whether the trial court resolved

---

[1] The trial court also concluded that Anderson and the Company had failed to state a claim upon which relief could be granted because their claims were barred by res judicata. We recognize that the actual conflict here that is the basis for federal conflict preemption is closely related to the doctrine of res judicata. Nonetheless, if the trial court lacked subject matter jurisdiction—as it determined and we affirm on appeal—then the court did not have jurisdiction to consider whether the complaint was barred by res judicata. See City of Hammond v. Bd. of Zoning Appeals, 152 Ind. App. 480, 487, 284 N.E.2d 119, 124 (Ind. Ct. App. 1972) ("When the trial court grants a motion to dismiss for lack of jurisdiction over the subject matter, it has made a final judgment. The trial court has no power to further adjudicate the question of whether or not the complaint stated a claim upon which relief could be granted.").

6

disputed facts; and (ii) if the trial court resolved disputed facts, whether it conducted an evidentiary hearing or ruled on a "paper record."

If the facts before the trial court are not in dispute, then the question of subject matter jurisdiction is purely one of law. Under those circumstances no deference is afforded the trial court's conclusion because "appellate courts independently, and without the slightest deference to trial court determinations, evaluate those issues they deem to be questions of law." Bader v. Johnson, 732 N.E.2d 1212, 1216 (Ind. 2000). Thus, we review de novo a trial court's ruling on a motion to dismiss under Trial Rule 12(B)(1) where the facts before the trial court are undisputed.

\* \* \*

[W]here the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is "in as good a position as the trial court to determine whether the court has subject matter jurisdiction." MHC Surgical Ctr. Assocs., Inc. v. State Office of Medicaid Policy & Planning, 699 N.E.2d 306, 308 (Ind. Ct. App. 1998). See also Farner v. Farner, 480 N.E.2d 251, 257 (Ind. Ct. App. 1985) (agreeing with the proposition that "where a case is tried wholly upon documents or stipulations, the appellate tribunal is in as good a position as the trial court to determine the force and effect of the evidence.") Thus, we review de novo a trial court's ruling on a motion to dismiss where the facts before the court are disputed and the trial court rules on a paper record.

GKN Co. v. Magness, 744 N.E.2d 397, 400-01 (Ind. 2001). Here, the trial court ruled on a paper record when it concluded that it lacked subject matter jurisdiction. Thus, our review is de novo.[2] Id.

On this issue, the trial court concluded that

The NLRB had jurisdiction to determine whether the conduct complained of occurred and its effect on the contract between the parties. . . .

---

[2] Anderson and the Company contend that reversal is required because they are entitled to "conduct discovery to prepare an adequate response" to Parks and the Union's evidence in support of the motion to dismiss. Appellants' Br. at 13. Anderson and the Company's argument on this issue is based on Indiana Trial Rule 12(B)(6), not Rule 12(B)(1). See Ind. Trial Rule 12(B). Because we do not consider the Rule 12(B)(6) issue, we need not consider this argument.

7

[T]he conduct of which Plaintiffs complain is preempted by the National Labor Relations Act, and exclusive jurisdiction over that claim rests with the NLRB. The parties' conduct at the March 8, 2005[,] meeting was central and critical to their entering into the agreement between the Plaintiffs and the [U]nion. Plaintiffs' complaints about Defendants' conduct at that meeting is within the jurisdiction of the NLRB.

Appellants' App. at 11.

Thus, the dispositive question on appeal is whether the trial court lacked subject matter jurisdiction over Anderson and the Company's claims because the National Labor Relations Act preempted those claims. As this court recently stated:

Because federal law is the supreme law of the land under the Supremacy Clause of the United States Constitution, state laws that interfere with or are contrary to federal law are invalidated under the preemption doctrine. Kuehne v. United Parcel Serv., Inc., 868 N.E.2d 870, 873 (Ind. Ct. App. 2007). " '[A] cardinal rule of preemption analysis is the starting presumption that Congress d[id] not intend to supplant state law.' " Id. (quoting N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995)). This presumption against preemption takes on added significance where federal law is claimed to bar state action in fields of traditional state regulation. Id. "Accordingly the historic police powers of the States are not to be superseded by a Federal Act 'unless that was the clear and manifest purpose of Congress.' " Id. (quoting Micronet, Inc. v. Ind. Util. Regulatory Comm'n, 866 N.E.2d 278, 285 (Ind. Ct. App. 2007)).

There are three variations of the federal preemption doctrine: (1) express preemption, which occurs when a federal statute expressly defines the scope of its preemptive effect; (2) field preemption, which occurs when a pervasive scheme of federal regulations makes it reasonable to infer that Congress intended exclusive federal regulation of the area; and (3) conflict preemption, which occurs when it is either impossible to comply with both federal and state or local law, or where state law stands as an obstacle to the accomplishment and execution of federal purposes and objectives. Id.

Florian v. Gatx Rail Corp., 930 N.E.2d 1190, 1195-96 (Ind. Ct. App. 2010) (alterations original; emphasis added), trans. denied. "The question, at bottom, is one of statutory intent, and we accordingly begin with the language employed by Congress and the

8

assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) (quotations omitted). Determining statutory intent is a question of law that we review de novo. See, e.g., State v. Prater, 922 N.E.2d 746, 748 (Ind. Ct. App. 2010), trans. denied.

The United States Supreme Court has discussed the history and purpose of the National Labor Relations Act as follows:

> Since 1935 the story of labor relations in this country has largely been a history of governmental regulation of the process of collective bargaining. In that year Congress decided that disturbances in the area of labor relations led to undesirable burdens on and obstructions of interstate commerce, and passed the National Labor Relations Act, 49 Stat. 449. That Act, building on the National Industrial Recovery Act, 48 Stat. 195 (1933), provided that employees had a federally protected right to join labor organizations and bargain collectively through their chosen representatives on issues affecting their employment. Congress also created the National Labor Relations Board to supervise the collective-bargaining process. The Board was empowered to investigate disputes as to which union, if any, represented the employees, and to certify the appropriate representative as the designated collective-bargaining agent. The employer was then required to bargain together with this representative and the Board was authorized to make sure that such bargaining did in fact occur. Without spelling out the details, the Act provided that it was an unfair labor practice for an employer to refuse to bargain. Thus a general process was established that would ensure that employees as a group could express their opinions and exert their combined influence over the terms and conditions of their employment. The Board would act to see that the process worked.
>
> The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement. . . .

H.K. Porter Co. v. N.L.R.B., 397 U.S. 102-03 (1970).

9

"It is implicit in the entire structure of the Act that the [NLRB] acts to oversee and referee the process of collective bargaining." Id. at 107-08.

> Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.

Garner v. Teamsters, 346 U.S. 485, 490 (1953). "When an activity is arguably subject to . . . the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245 (1959).

Here, the relevant provisions of the Act state:

It shall be an unfair labor practice for an employer—

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by . . . this title; . . .

> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of . . . this title.

29 U.S.C. § 158(a) ("Section 8"). Further, it has long been federal law that the Act imposes a duty to bargain in good faith. See, e.g., Nat'l Licorice Co. v. N.L.R.B., 309 U.S. 350, 358 (1940); see also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am., 523 U.S. 653, 662 (1998) (Stevens, J., concurring) ("If the Union's allegations are true, it seems clear that petitioner violated its statutory duty to bargain in good faith.").

10

As stated above, the trial court determined that it lacked subject matter jurisdiction based on its review of a paper record, namely, the attachments to Parks and the Union's motion to dismiss. According to those documents, on March 17, 2006, the Union, through Parks as its representative, filed an amended charge against the Company with the NLRB. According to the charge, the Company violated Section 8 when it terminated the employment of the Union employees who had been hauling the c-fines because the Company had "refused to bargain in good faith" with the Union "over unilateral changes in conditions of employment and also discriminated against its employees by terminating their employment." Appellants' App. at 41.

The NLRB reviewed the evidence submitted by the parties and determined that the Union's charge was meritorious. Accordingly, the NLRB issued a formal complaint against the Company. In relevant part, the NLRB alleged as follows:

VIII
About February 2006, Respondent [Company], by Martin Surdell, promised its employees jobs with Group on the condition that they would work for non-Union wages and without any Union benefits.

IX
(a) About February 2006, Respondent discharged/laid off its employees . . . .

(b) About February 2006, Respondent ceased the business operations of ESC [of hauling by truck steel-related byproducts].

(c) Respondent engaged in the conduct described above in paragraphs IX(a-b) because the named employees of Respondent were represented by the Union for collective bargaining, and in order to avoid its obligations under the Act and its collective bargaining agreement with the Union and to discourage employees from engaging in union and concerted activities.

X

11

> (a)     About February or early March 2006, Respondent continued its business operations in the disguised form of Group . . . in order to avoid its collective-bargaining obligation to the Union.

Id. at 44.

The ALJ held an evidentiary hearing on the NLRB's complaint. At that hearing, both the Company and the Union presented evidence, including witnesses subject to cross examination. Anderson and Parks each testified concerning the negotiations of March 8, 2005. Anderson's testimony about those negotiations was substantially similar to the facts underlying the complaint in the instant appeal. Compare id. at 55-56 with id. at 12-17.

The ALJ expressly found that "Parks credibly testified" about the events at that meeting and that the ALJ "did not find Anderson's testimony concerning the content of the March 8, 2005[,] meeting to be credible." Id. at 49, 56. The ALJ then concluded as follows:

> The evidence in the instant case reveals that on March 8, 2005, Anderson and Surdell met Parks at the Union's office, and that following a discussion concerning the provisions of the Union's standard commodity [Section 9(a)] and construction [Section 8(f)] agreements, Anderson elected to sign the construction agreement. I have credited Parks' testimony of the content and nature of the discussion in that meeting over Anderson's. Parks' credited testimony reveals that Anderson elected to sign the construction industry agreement over the commodity agreement because, unlike the commodity agreement, the construction agreement provided the employees were to be paid by the hour, and their fringe benefits were also based on their hours of work. The construction industry agreement also did not provide for vacations and seniority. During the discussion, Parks told Anderson he would prefer to have him sign the commodity agreement because Anderson had told Parks that the drivers would be hauling product between steel mills, and Parks informed Anderson this was not really construction work. However, Parks agreed to Anderson's election to sign the construction agreement as an accommodation to Anderson, and because the wages were similar in the commodity and construction agreements.

12

> Thus, on March 8, 2005, Anderson, on behalf of ESC, signed the Union's "General Construction of Building, Heavy & Highway Projects" contract. The contract's effective dates were June 1, 2003, to May 31, 2006. Parks credibly denied that Anderson took notes during the meeting. Parks also credibly denied telling Anderson that he could terminate the agreement at the end of the collective-bargaining agreement or when ESC's then current contract for hauling c-fines ended. Parks credibly denied that Section 8(f) of the Act was discussed prior to Anderson's signing of the Union's contract.

Id. at 64-65 (footnotes omitted). That is, based on its express consideration of the witnesses' testimonies, the ALJ concluded that Anderson knowingly and deliberately entered into the Section 8(f) contract rather than the Section 9(a) contract despite Parks' advice to the contrary. The ALJ then concluded that the Company was prohibited by law from entering into a Section 8(f) contract and, instead, concluded that "the contract in the instant case was based on a 9(a) relationship." Id. at 65.

Under the nature of the Section 9(a) relationship, the ALJ concluded that the Company violated Section 8(a)(1) of the Act when it conditioned job offers to the Union employees upon their working for a nonunion company without union wages and benefits. Id. at 47, 66. The ALJ further concluded that the company violated Section 8(a)(5) when it terminated the employment of the Union workers it had hired to haul the c-fines. Upon the Company's appeal, the NLRB affirmed and adopted the recommended order of the ALJ. The NLRB then requested the United States Court of Appeals for the Seventh Circuit to enforce its order, and the Seventh Circuit granted the NLRB's request.

Here, each of Anderson and the Company's three state law claims against Parks and the Union is based essentially on the exchange between Anderson and Parks during the March 8, 2005, meeting. The contents and legal meaning of that exchange were not

merely arguably before the ALJ in the NLRB proceedings but, indeed, were actually before and critical to the ALJ's resolution of the NLRB's complaint under the Act.[3]  See Garmon, 359 U.S. at 245.  As such, it would be impossible for a state court to determine the merits of Anderson and the Company's allegations without becoming an obstacle to the federal objective of having the NLRB exclusively "oversee and referee" the collectively bargaining process between these two entities.  See H.K. Porter Co., 397 U.S. at 107-08.

Further, if a state court were to rule in favor of Anderson and the Company on their claims, it would be "impossible [for Parks and the Union] to comply with both federal and state or local law" since the state judgment and the federal judgment would be in conflict.  See Florian, 930 N.E.2d at 1195-96.  Anderson and the Company requested the trial court to grant relief "to compensate Plaintiffs for actual damages, including any amounts Plaintiffs are ordered to pay" by the NLRB, as well as "attorney fees in defense of the NLRB charges."  Appellants' App. at 21.  For a trial court to grant the requested relief would nullify, at least in part, the NLRB's award of damages because Parks and the Union would have to remit those damages to the Company, the same entity guilty of having engaged in unfair labor practices in the first instance.

Still, Anderson and the Company contend that they could not have raised their three state law claims to the ALJ in the NLRB proceedings.  Even assuming for the sake

---

[3]  In light of the ALJ's actual resolution of this issue, we need not consider Anderson and the Company's argument that this appeal is controlled by International Longshoremen's Ass'n v. Davis, 476 U.S. 380 (1986), and Belknap v. Hale, 463 U.S. 491 (1983).  Among other reasons for those cases not applying here, neither involved a prior legal decision by the NLRB in favor of the state court defendants, as in the instant appeal.  Indeed, as Anderson and the Company concede, "[b]oth Davis and Belknap require that the claims alleged to be preempted could have been brought before the NLRB and decided in the Defendants' favor . . . ."  Appellants' Br. at 23.

of argument that the ALJ would have not entered a judgment on any state law claims raised by Anderson and the Company, Anderson and the Company did raise, and the ALJ did hear and determine, the facts underlying those claims. Indeed, as discussed above, that determination was essential to the ALJ's order against the Company. In other words, Anderson and the Company put the factual issues underlying their state law claims in play, and they lost. Their request to have a state court reconsider those facts creates an actual conflict with federal law that divests Indiana's courts of subject matter jurisdiction.[4]

Accordingly, Anderson and the Company's state law claims are preempted by their actual conflict, on these facts, with the NLRB's exercise of jurisdiction against them under the Act. See id. Thus, the trial court properly determined that it had been divested of its subject matter jurisdiction over the state law claims, and we affirm the trial court's judgment.

Affirmed.

ROBB, C.J., and VAIDIK, J., concur.

---

[4] As stated above in footnote 1, we recognize that the actual conflict here on which the federal preemption of the state law claims is based is closely related to the doctrine of res judicata. We emphasize, however, that we do not reach the merits of this matter in light of our lack of subject matter jurisdiction.